Municipio Autónomo de Peñuelas, representado por el Hon. Walter Torres Maldonado, alcalde, peticionario, *v.* Ecosystems, Inc., recurrido.

*Número:* CC-2015-0325 *Resuelto:* 19 de diciembre de 2016

6

*Verónica A. Pagán Torres* y *Juan De Jesús Vélez*, abogados del Municipio Autónomo de Peñuelas, parte recurrente; *Miguel L. Torres Torres*, abogado de la parte recurrida; *José A. Cuevas Segarra*, de *Bufete José A. Cuevas Segarra*, abogado de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR COLÓN PÉREZ emitió la opinión del Tribunal.

En el presente caso nos corresponde determinar si el Municipio Autónomo de Peñuelas puede prohibir válidamente, mediante una ordenanza municipal, el uso de material de relleno de construcción —en específico, agregado manufacturado a base de cenizas producto de la quema de carbón por la producción de energía— dentro de sus límites territoriales.

Adelantamos que, al examinar detenida y cuidadosamente las disposiciones legales que gobiernan el asunto, contestamos la interrogante en la afirmativa dado que, ausente una disposición en contrario del gobierno estatal, prevalece la ordenanza municipal. Veamos.

I

El 25 de marzo de 2013, la Oficina de Gerencia de Permisos (OGPe) expidió un Permiso General Consolidado (permiso consolidado), junto a la Junta de Calidad Ambiental (JCA), a favor de Ecosystems, Inc. (Ecosystems o recurrida) para la construcción de una instalación de sistema de relleno sanitario en la carretera estatal PR-385, km. 4.4 en el barrio Encarnación del municipio de Peñuelas (Municipio o peticionario). El propósito de dicha instalación era disponer de forma final de los desperdicios sólidos no peligrosos. *El referido permiso consolidado meramente autorizaba la construcción de un vertedero; nada disponía en cuanto a materiales de construcción o relleno a ser utilizados en la instalación que se construiría.*

El 9 de abril de 2013, con vigencia a partir del 10 de abril del mismo año, la Legislatura Municipal de Peñuelas

aprobó la Ordenanza Núm. 13, Serie 2012–2013 (Ordenanza Municipal) con el fin de prohibir el uso de cenizas procedentes de la quema de carbón en plantas generadoras de energía *como material de relleno o construcción.* Específicamente, la ordenanza en cuestión dispone que

> [s]e prohíbe el uso de cenizas procedentes de la quema de carbón, en plantas generadoras de energía, como material de relleno y su depósito sobre terrenos en los límites territoriales del Municipio de Peñuelas. [A t]oda persona natural o jurídica que viole esta prohibición, se le impondrá una multa administrativa de $5,000.00 dólares. Apéndice del *Certiorari,* pág. 92.

Dicha Ordenanza Municipal establece, además, que toda persona —ya sea desarrollador, constructor, compañía o persona jurídica o natural— que interese realizar una construcción en el Municipio, *"presentar[á], al momento de[l] pago de los arbitrios municipales, una declaración jurada donde certificar[á] que en su proyecto no se usa[n] cenizas derivadas de la quema de carbón como material de construcción o relleno, llámese AGREMAX*(¹) *o con cualquier otro nombre comercial".* (Énfasis suplido). Apéndice del *Certiorari,* pág. 92.

Así las cosas, el 18 de junio de 2014 Ecosystems acudió ante la OGPe y la JCA para solicitar una modificación al permiso consolidado previamente obtenido. A tales efectos, el 25 de junio de 2014 se expidió un nuevo permiso consolidado mediante el cual se autorizó, entre otras cosas, la utilización de agregado manufacturado como material de relleno en la construcción. Sin embargo, a pesar de existir una prohibición en el Municipio en torno al uso de material proveniente de la quema de carbón como relleno sanitario, el permiso consolidado enmendado nada dispuso en torno a los materiales de construcción.

Más adelante, conforme a las facultades reservadas mediante los permisos expedidos, personal de la JCA inspec-

---

(¹) El *Agremax* es un material que suele ser utilizado como material de construcción o relleno y proviene de la quema de cenizas de carbón.

cionó el área de construcción de Ecosystems y supo de la utilización del agregado manufacturado conocido comercialmente como *Agremax* por parte de Ecosystems. A raíz de ello, el Municipio presentó una demanda en solicitud de *injunction* preliminar y permanente mediante la cual alegó que Ecosystems estaba violando la Ordenanza Municipal al utilizar el referido producto en su proyecto de sistema de relleno sanitario.

Tras varios incidentes procesales, que no es necesario pormenorizar aquí, el Tribunal de Primera Instancia emitió una Orden de entredicho provisional y ordenó a Ecosystems que desistiera de utilizar *Agremax* en el Municipio hasta que se dispusiera otra cosa. Posteriormente, durante la celebración de la vista de *injunction* ante dicho foro, Ecosystems presentó una solicitud de desestimación fundamentándose en que la Ordenanza Municipal era *ultra vires* y, por lo tanto, nula. Según la contención de la recurrida, el Municipio carecía de autoridad para reglamentar el uso de *Agremax*, dado a que tal uso ha sido autorizado tanto por agencias estatales como federales. Además, Ecosystems arguyó que la vigencia de la Ordenanza tuvo el efecto de afectar sus derechos propietarios y su derecho al debido proceso de ley.

El 18 de septiembre de 2014, el Tribunal de Primera Instancia declaró "ha lugar" la demanda incoada por el Municipio y, en consecuencia, ordenó a Ecosystems el cese y desista de la utilización de *Agremax*. Según concluyó el foro primario, la controversia era de estricto derecho y se limitaba a establecer si el Municipio poseía autoridad para aprobar la Ordenanza Municipal y qué impacto tenía sobre el permiso consolidado enmendado otorgado por la JCA y la OGPe. Luego de evaluar el expediente, el Tribunal de Primera Instancia razonó que el permiso consolidado enmendado no autorizaba expresamente el uso de *Agremax* o de agregado manufacturado a base de cenizas producto de la quema de carbón. Por esa razón, resolvió que la prohibi-

ción municipal al uso de *Agremax*, o de cualquier agregado manufacturado a base de cenizas producto de la quema de carbón, era oponible a Ecosystems, pues no entraba en conflicto con lo dispuesto en el permiso consolidado enmendado emitido por la JCA y la OGPe. Para el foro primario, si bien Ecosystems puede continuar la construcción, según lo autorizado, no podrá usar agregado manufacturado a base de cenizas de la quema de carbón como material de relleno. Ese foro fundamentó su decisión en que no surge del expediente que la JCA ni la OGPe hubiesen autorizado expresamente el uso de ese material. Por último, el tribunal sentenciador determinó que la Ordenanza Municipal es de aplicación general, que no interfiere de forma alguna con el permiso consolidado expedido a favor de Ecosystems relativo a la construcción de un sistema de relleno sanitario.

Inconforme, Ecosystems apeló la referida sentencia ante el Tribunal de Apelaciones. La recurrida solicitó que el foro apelativo intermedio declarara la nulidad de la Ordenanza Municipal basado en que el asunto relativo a la regulación del uso y la disposición de residuos de combustión de carbón está ocupado por legislación federal. Igualmente, Ecosystems arguyó que la Ordenanza Municipal era de aplicación específica y no general, por lo que el Municipio le violó su derecho al debido proceso de ley al no proveer una notificación adecuada de la aprobación de la referida ordenanza.

Por su parte, el Municipio alegó que la JCA no ha regulado el uso de *Agremax* y que la Ordenanza Municipal en cuestión complementa las disposiciones regulatorias de las agencias que atienden el asunto de desperdicios sólidos. Según el Municipio, ante la ausencia de una prohibición específica en alguna ley estatal, la legislación municipal aprobada mediante la Ordenanza Municipal es válida siempre y cuando no esté en contravención con legislación estatal. Finalmente, el Municipio sostuvo que la Orde-

nanza Municipal es de aplicación general, por lo que Ecosystems estaba obligado a impugnar el precepto municipal dentro del término de caducidad de veinte días que dispone la Ley de Municipios Autónomos, *infra*.

Evaluados los planteamientos y las comparecencias de ambas partes, el Tribunal de Apelaciones dictó sentencia. Mediante la misma revocó en su totalidad la orden de *injunction* permanente emitida por el Tribunal de Primera Instancia y determinó que aunque la aplicación de la Ordenanza Municipal era "teóricamente" general, "su efecto real es de aplicación particular a Ecosystems",[2] por lo que Ecosystems había quedado afectada por la actuación del Municipio. Por ello, el Tribunal de Apelaciones razonó que el término de caducidad de veinte días para impugnar alguna actuación de un municipio no había comenzado a transcurrir. Asimismo, el foro intermedio concluyó que el Municipio falló en demostrar la ausencia de un remedio adecuado en ley para la concesión de un *injunction* a su favor.

Insatisfecho aún, el Municipio acudió ante este Tribunal mediante un recurso de *certiorari*. En síntesis, alegó que el Tribunal de Apelaciones erró al determinar que la Ordenanza Municipal aplicaba específicamente a Ecosystems y no de manera general, según dispuesto en el texto del referido cuerpo legislativo y de acuerdo con su exposición de motivos. Además, alegó que el foro apelativo intermedio incidió al determinar que el Municipio debió haber notificado a Ecosystems por escrito y correo regular y certificado de la aprobación de la Ordenanza Municipal para que comenzara a transcurrir el término de veinte días dispuesto en la Ley de Municipios Autónomos, *infra*, para impugnar la aprobación de una ordenanza o acto legislativo municipal. Entiende el Municipio que, por ser de aplicación general y no específica a Ecosystems, el término para

---

[2] Véase Sentencia del Tribunal de Apelaciones, págs. 26–27, en Apéndice del *Certiorari*, págs. 28–29.

impugnar la Ordenanza comenzó a transcurrir desde su aprobación.

Por su parte, Ecosystems compareció ante nos mediante su Alegato en Oposición a *Certiorari*. Repitió sus alegaciones en cuanto a la aplicación específica de la Ordenanza Municipal a sus operaciones. Asimismo, arguyó que el ente con la facultad para establecer los requisitos aplicables al manejo y la disposición, entre otros, de desperdicios sólidos es la Agencia de Protección del Medio Ambiente de Estados Unidos (*Environmental Protection Agency*, EPA). Por lo tanto, plantea que la Ordenanza Municipal es una nula y *ultra vires*.

Expedido el auto de *certiorari* y con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

## II

Como cuestión de umbral, y para la correcta disposición de los asuntos ante nuestra consideración, es menester atender, en primera instancia, el planteamiento relacionado a cuál es el ente encargado en Puerto Rico de establecer los requisitos aplicables al manejo y la disposición, entre otros, de los desperdicios sólidos. Es decir, debemos determinar si las agencias de la Rama Ejecutiva, la Rama Legislativa y los municipios del País pueden regular dicho asunto o si, por el contrario, es un campo ocupado por las agencias federales.

La *doctrina de campo ocupado* se ha desarrollado con el propósito de evitar conflictos regulatorios entre dos gobiernos, fomentando así una política uniforme. *González v. Mayagüez Resort & Casino*, 176 DPR 848, 856 (2009); *Rivera v. Security Nat. Life Ins. Co.*, 106 DPR 517, 523 (1977). Por ello, se entiende que existe jurisdicción exclusiva del Gobierno federal sobre los asuntos de derecho federal en aquellas instancias en las que *el Congreso así lo ha dispuesto expresamente* o cuando la *clara intención de*

*la ley es privar de jurisdicción* a los tribunales estatales sobre un asunto federal. *González v. Mayagüez Resort & Casino,* supra, págs. 856–858; *Rodríguez v. Overseas Military,* 160 DPR 270, 277–278 (2003); *Yellow Freight System, Inc. v. Donnelly,* 494 US 820, 823 (1990). Según se puede colegir, lo fundamental será determinar cuál ha sido la intención del Congreso al legislar.

■ De igual forma, se entiende que hay campo ocupado o desplazado en aquellas circunstancias en las que *"cierto interés o propósito federal es tan dominante que no debe existir reglamentación estatal, o cuando la normativa estatal podría producir un resultado incompatible con los objetivos federales en determinada área". Rodríguez v. Overseas Military,* supra, pág. 282, citando a *City of Burbank v. Lockheed Air Terminal,* 411 US 624, 633 (1973). Conforme a esta doctrina, cualquier ley estatal que contravenga una ley federal es nula. Véanse: *Franklin California Tax-Free Trust v. Puerto Rico,* 85 F.Supp.3d 577, 595 (D. PR 2015), citando a *Tobin v. Fed. Exp. Corp.,* 775 F.3d 448, 452 (1er Cir. 2014); *Crosby v. National Foreign Trade Council,* 530 US 363, 372 (2000).

■ En conformidad con lo anterior, y pertinente a la controversia ante nuestra consideración, el Congreso de Estados Unidos creó la Ley de Conservación y Recuperación de los Recursos de 1976, según enmendada, 42 USC sec. 6901 *et seq.,* para atender los asuntos relativos a la disposición y almacenamiento de desperdicios sólidos y peligrosos, entre otros. *Meghrig v. KFC Western, Inc.,* 516 US 479, 483 (1996). Dicha legislación promueve un esquema de cooperación mediante el cual se exhorta a las municipalidades y estados a trabajar con el gobierno federal central para desarrollar prácticas de manejo de desperdicios que faciliten la recuperación de energía de desperdicios sólidos. 42 USC sec. 6902(a)(11).(³) Véanse, además: *AES Puerto*

---

(³) El referido artículo dispone, en lo aquí pertinente, de la manera siguiente:

*Rico, L.P. v. Trujillo-Panisse*, 133 F.Supp.3d 409 (D. PR 2015); *Blue Circle Cement v. Board of County Com'rs*, 27 F.3d 1499, 1506 (10mo Cir. 1994). Asimismo, conforme a dicho estatuto federal, la EPA fue designada como la entidad encargada de identificar qué desperdicios son tóxicos o dañinos.

Sabido es que la EPA es la agencia federal encargada de proteger la salud de los ciudadanos y el medioambiente, ejecutando y obligando el cumplimiento de las leyes aprobadas por el Congreso de Estados Unidos. Como ente regulador, atiende aquellos asuntos nacionales relacionados con el cambio climático, polución del aire y el agua, sustancias tóxicas, seguridad química, entre otros.([4]) Particularmente, por delegación del Congreso mediante la Ley de Conservación y Recuperación de los Recursos de 1976, la EPA fue el ente encargado de determinar si la ceniza de carbón era un desperdicio tóxico o no.

■ Cónsono con lo anterior, y en lo que aquí nos atañe, el 17 de abril de 2015 la EPA promulgó una norma reglamentaria relativa a la disposición segura de residuos provenientes de combustión de carbón, a saber: *Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities*, 80 Fed. Reg. 21302 (17 de abril de 2015) *(Final Rule)*. Según se desprende de su propio texto, el propósito de la *Final Rule* era fijar los *criterios nacionales mínimos para la disposición de residuos de combustión de carbón*. Véase 80 Fed. Reg. 21302–21303. Al respecto, la referida disposición reglamentaria establece:

---

"The objectives of this chapter are to promote the protection of health and the environment and to conserve valuable material and energy resources by—

. . . . . . . . . .

"(*11*) establishing a cooperative effort among the Federal, State, and local governments and private enterprise in order to recover valuable materials and energy from solid waste".

([4]) Véase Agencia de Protección Ambiental de Estados Unidos, "Los asuntos de la EPA" (última visita, 14 de noviembre de 2016).

*The legislation is clear that these are minimum requirements only, and without preemptive effect; states may therefore impose more stringent requirements, including the requirement that CCR facilities obtain a permit.* This is also wholly consistent with longstanding EPA interpretations. See 44 FR 53438, 53439 (September 13, 1979) ("the standards established in the criteria constitute minimum requirements. These criteria do not preempt other state and federal requirements. Nothing in the Act precludes the imposition of additional obligations under authority of other laws on parties engaged in solid waste disposal."); see also 44 FR 45066 (July 31, 1979) ("EPA establishes only 'minimum' requirements under this portion of the Act which should not prevent States from developing broader programs or stricter standards under authority of State law."). States may also incorporate the federal requirements into state law—whether through revisions to existing legislation or regulation, or through incorporating them into any permits issued to CCR facilities. Such an approach would also resolve commenters' concerns about the potential for "parallel and redundant regulatory programs." (Énfasis suplido). 80 Fed. Reg. 21332.

Según se puede colegir, mediante dicha norma, la EPA estableció aquellos requisitos mínimos, *sin que ello tenga el efecto de desplazar cualquier acción o reglamentación estatal.* 80 Fed. Reg. 21332. Es decir, *los estados quedan facultados para imponer requisitos más estrictos en cuanto a este asunto, incluso el requisito de que las instalaciones dedicadas a disponer de residuos de combustión de carbón obtengan un permiso para ello.* Íd.

 De igual forma, en cuanto a la implementación de estos criterios nacionales mínimos, la *Final Rule* expone lo siguiente:

In order to ease implementation the regulatory requirements for CCR landfills and CCR surface impoundments, EPA strongly encourages the states to adopt at least the federal minimum criteria into their regulations. *EPA recognizes that some states have already adopted requirements that go beyond the minimum federal requirements*; for example, some states currently impose financial assurance requirements for CCR units, and require a permit for some or all of these units. This rule will not affect these state requirements. *The federal cri-*

*teria promulgated today are minimum requirements and do not preclude States' from adopting more stringent requirements where they deem to be appropriate.* (Énfasis suplido). 80 Fed. Reg. 21430.

Del texto citado claramente se deduce que, en primer lugar, los estados no están obligados a adoptar o implementar automáticamente la norma que nos ocupa, establecida por la EPA, sino que exhorta a las jurisdicciones a acoger los requisitos mínimos esbozados. Es decir, esta determinación de la EPA *no impide que un estado adopte requisitos más estrictos, si lo estima necesario.* Ausente alguna disposición en contrario y según el texto íntegro de la *Final Rule*, es indiscutible que un estado puede, dentro de sus límites territoriales, prohibir válidamente la disposición y uso de residuos de la quema de carbón resultado de la producción de energía.

## III

■ Por otro lado, paralelo a la EPA, la JCA es la agencia del Estado Libre Asociado de Puerto Rico encargada de proteger y conservar el medioambiente. Véase Ley Núm. 416-2004, Ley sobre Política Pública Ambiental, 12 LPRA sec. 8001 *et seq.* Este estatuto declara que será

[...] política continua del Gobierno del Estado Libre Asociado, *incluyendo sus municipios*, en cooperación con las organizaciones públicas y privadas interesadas, el utilizar todos los medios y medidas prácticas, incluyendo ayuda técnica y financiera, con *el propósito de alentar y promover el bienestar general* y asegurar que los sistemas naturales estén saludables y tengan la capacidad de sostener la vida en todas sus formas, así como la actividad social y económica, en el marco de una cultura de sustentabilidad, *para crear y mantener las condiciones bajo las cuales el hombre y la naturaleza puedan existir en armonía productiva* y cumplir con las necesidades sociales y económicas y cualesquiera otras que puedan surgir con las presentes y futuras generaciones de puertorriqueños. (Énfasis suplido). 12 LPRA sec. 8001(a).

Por mandato expreso, la JCA quedó facultada para preparar y desarrollar proyectos y programas que, entre otros asuntos, atiendan lo relativo a la disposición adecuada de los desperdicios sólidos. 12 LPRA sec. 8002c. A tenor con ello, la JCA adopta las normas o reglamentos *"para la disposición de desperdicios sólidos y para fijar los sitios y métodos para la disposición de estos desperdicios"*. 12 LPRA sec. 8002c(b)(4)(A). En ese sentido, la JCA puede promulgar aquellas normas y regulaciones necesarias para establecer un método de registro, *permisos y licencias para la ubicación y operación* de plantas o instalaciones para la recuperación, el procesamiento y la disposición final de desperdicios sólidos. Véase 12 LPRA sec. 8002c(b)(9)(B). En cuanto a este particular, el referido estatuto dispone que "[l]os *planos para la construcción* de estas plantas o sistemas deberán ser sometidos" ante la consideración de la JCA para su correspondiente aprobación, "sin defecto de la obligación de los solicitantes de cumplir con las disposiciones de las demás leyes aplicables". (Énfasis suplido). Íd. Además, la JCA podrá emitir aquellas órdenes que estime necesarias para asegurar que la operación de estas plantas o sistemas no ocasionen daño al ambiente. Íd.

█ Conforme al Reglamento para el Control de los Desperdicios Sólidos Peligrosos y No Peligrosos, según enmendado, Reglamento Núm. 2863 de la Junta de Calidad Ambiental (Reglamento Núm. 2863), esta agencia otorga *permisos para construir y operar instalaciones que se dediquen al manejo y la disposición de desperdicios sólidos.* Véase Parte IX del Reglamento Núm. 2863, *supra.* Específicamente, dispone que en toda circunstancia en la cual la JCA vaya a conceder un *permiso de construcción,* la agencia preparará un borrador y procederá a notificar "mediante aviso público, la oportunidad de vistas públicas, emitirá una decisión final y contestará los comentarios". Regla IX-912(E)(5)del Reglamento Núm. 2863, *supra,* pág. IX-49. Asimismo, en lo que aquí nos compete, se dispone

que cuando un borrador de permiso ha sido preparado, la JCA publicará un aviso público mediante el cual provea, por lo menos, cuarenta y cinco días para recibir comentarios del público. Regla IX-912(H)(1) y (2), respectivamente, del Reglamento Núm. 2863, *supra*, págs. 52–53. Así, la JCA queda obligada a recibir los comentarios del público en general y, a su vez, facultada, dentro de su discreción, para celebrar vistas públicas en aquellas circunstancias en las que exista un "interés significativo" de parte del público. Regla IX-912(I) y (J), respectivamente, del Reglamento Núm. 2863, *supra*, págs. 55–56.

■ En cuanto al proceso de modificación de un permiso ya otorgado por la JCA, la Regla IX-912(D) del Reglamento Núm. 2863, *supra*, págs. 45–48, establece, en lo aquí pertinente, que estos podrán ser modificados, revocados, reexpedidos o terminados a solicitud de cualquier parte o a iniciativa propia de la JCA. Ello, cuando las reglas aplicables hayan sido modificadas; los términos y las condiciones del permiso se hayan violado; la modificación sea esencial para proteger la salud humana y el ambiente; ante la existencia de alguna condición de emergencia, o cuando el poseedor de un permiso "ha fallado en exponer completamente los datos relevantes en la solicitud o durante el proceso de emisión del permiso, o ha incurrido en falsa representación de cualquier hecho en cualquier momento". Íd.

Asimismo, la referida regla dispone que "[c]*uando se vaya a modificar un permiso, en conformidad con esta sección, sólo las condiciones a ser modificadas serán reabiertas a discusión cuando se prepare el nuevo borrador de permiso*". (Énfasis suplido). Regla IX-912(D) del Reglamento 2863, *supra*, pág. 47.([5]) Los demás aspectos del permiso previamente otorgado quedarán en vigor hasta que termine su vigencia.

---

([5]) Si bien ello no está señalado como error en el recurso, del expediente del caso no surge claramente si se llevó a cabo o no.

Por otra parte, la JCA promulgó el Reglamento para el Manejo de los Desperdicios Sólidos No Peligrosos, según enmendado, Reglamento Núm. 5717 de 14 de noviembre de 1999. Sin embargo, ningún acápite o sección del mismo define lo que es un agregado manufacturado ni dispone el tratamiento que deberá dársele, en lo aquí relacionado, a los diversos tipos de cenizas provenientes de la quema de carbón.

En fin, la JCA es la agencia encargada por ley para determinar la forma y manera en la que se debe instalar, operar y mantener las instalaciones para la disposición final de desperdicios sólidos, por lo que aprueba los permisos de construcción en conformidad con su política pública.

IV

Finalmente, la Ley Núm. 81-1991, conocida como Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico (Ley de Municipios Autónomos), 21 LPRA sec. 4001 *et seq.*, es la piedra angular de los procesos de reforma municipal iniciados a principio de la década de los noventa. Véanse: M. Negrón Portillo y L. Santana Rabell, *La reforma municipal en Puerto Rico: retos y oportunidades*, Puerto Rico, Escuela Graduada de Administración Pública de la Universidad de Puerto Rico, 1993, pág. 14; *Alcalde de Guayama v. ELA*, 192 DPR 329, 335 (2015).

Dicha reforma se instrumentó con el propósito de *"iniciar un proceso de renovación político-administrativa del gobierno municipal con la finalidad de fomentar una mayor autonomía y la descentralización gubernamental de Puerto Rico"*. (Énfasis suplido). Negrón Portillo y Santana Rabell, *op. cit.*, pág. 14. Véanse: *Mun. de Ponce v. A.C. et al.*, 153 DPR 1, 22 (2000); *Alcalde Mun. de Humacao v. Ramos Cofresí*, 140 DPR 587, 595 (1996). Entre las metas que se contemplaron al momento de aprobarla se encontraban: *"(1) la transferencia de poderes, mecanismo de descen-*

*tralización de competencias del Gobierno Central hacia los municipios mediante el establecimiento de convenios. [...] (2) la reforma administrativa y (3) la autonomía fiscal, razón por la cual se crea el Centro de Recaudación de Ingresos Municipales*". (Énfasis suplido y en el original). *Mun. de Ponce v. A.C. et al.*, supra, pág. 22. Véase *Ortiz y otros v. Mun. de Lajas*, 153 DPR 744, 754 (2001).

De acuerdo con lo anterior, se declaró, como política pública del Estado Libre Asociado de Puerto Rico, otorgar a los municipios del País el máximo posible de autonomía y proveerles las herramientas financieras, además de los poderes y las facultades necesarias para asumir un rol central y fundamental en el desarrollo urbano, social y económico de nuestro pueblo. Art. 1.002 de la Ley Núm. 81-1991, *supra*, 21 LPRA sec. 4001 n. Véanse: *Rivera Fernández v. Mun. Carolina*, 190 DPR 196 (2014); *The Sembler Co. v. Mun. de Carolina*, 185 DPR 800, 811–812 (2012); *E.L.A. v. Crespo Torres*, 180 DPR 776, 787 (2011).

Así pues, mediante la aprobación del referido estatuto, se amplió el ámbito de facultades y funciones de los municipios, se autorizó la transferencia de competencias de planificación y reglamentación de sus territorios, y se autorizó la delegación de otras materias de la competencia del Gobierno central. *Gobierno Ponce v. Caraballo*, 166 DPR 723, 731 (2006); *Maymí v. Gob. Mun. Aut. Ponce*, 151 DPR 689 (2000).

Asimismo, el Art. 2.004 de la Ley de Municipios Autónomos, 21 LPRA sec. 4054, facultó a los municipios para *"ordenar, reglamentar y resolver cuando sea necesario o conveniente para atender las necesidades locales y para su mayor prosperidad y desarrollo"*. (Énfasis suplido). También se les delegó crear la política, las estrategias y los planes dirigidos a *ordenar su territorio y a la conservación de sus recursos*. 21 LPRA sec. 4054(h). Véase, además, F. Figueroa Santiago, *La promesa de autonomía municipal*

*desde la perspectiva del Tribunal Supremo de Puerto Rico,* 3 (Núm. 1) Rev. Jur. AAPR 69 (2016).

 Cónsono con lo anterior, y relacionado con la controversia ante nuestra consideración, la Ley de Municipios Autónomos le confiere a cada municipio del País la facultad de "reglamentar el manejo de desperdicios sólidos *en armonía con la política pública ambiental del Estado Libre Asociado de Puerto Rico,* disponer por ordenanza la forma en que se llevará a cabo el manejo de desperdicios sólidos e imponer penalidades por violaciones a las normas que se adopten". (Énfasis suplido). 21 LPRA sec. 4055. A tales efectos, se define el concepto "manejo de desperdicios sólidos" como *"la administración y control sistemático de todas las actividades asociadas a los desperdicios sólidos* [...]". (Énfasis suplido). 21 LPRA sec. 4055(4).

 Así pues, salvo que otra cosa se disponga mediante ley o reglamentación, la Legislatura Municipal queda revestida del poder de aprobar aquellas ordenanzas necesarias para promover y adelantar su propia política pública, siempre y cuando no contravenga la establecida por el Estado. Véase Art. 2.005 de la Ley Núm. 81 de 30 de agosto de 1991 de Municipios Autónomos, 21 LPRA sec. 4055. Véase, además, *López, Fed. Coms. Unidos v. Mun. de San Juan,* 121 DPR 75, 88 (1988) ("[T]oda ordenanza municipal regulatoria tiene que estar en armonía con el ordenamiento estatal, el cual ha de prevalecer en situaciones conflictivas").

## V

En el presente caso, la JCA y la OGPe otorgaron un permiso consolidado a favor de Ecosystems para la *construcción de un sistema de relleno sanitario.* Como señalamos anteriormente, nada se dispuso en cuanto a los materiales que se utilizarían en la referida construcción ni el tipo de relleno que manejaría Ecosystems.

Luego de la aprobación de la Ordenanza Municipal —objeto de este pleito por la Legislatura Municipal de Peñuelas—, en la que se prohibió la utilización de cenizas derivadas de la quema de carbón como material de construcción o de relleno, y a solicitud de Ecosystems, la JCA y la OGPe autorizaron una enmienda al referido permiso. Sin embargo, a pesar de existir la prohibición local del uso de cenizas producto de la quema de carbón por la producción de energía, el permiso nada dispuso en torno al uso de este tipo de material de construcción. Es decir, no se autorizó expresamente el uso del material prohibido por la Ordenanza Municipal. Tampoco surge que la intención de las agencias fuese que la vigencia de su permiso no se viera afectada tangencialmente por prohibiciones locales.

Ecosystems alega que la Ordenanza Municipal aprobada por el Municipio es nula y *ultra vires*, toda vez que entiende que las entidades con "jurisdicción exclusiva" para regular lo relativo a los desperdicios sólidos son la EPA y la JCA. Es la contención de la recurrida que, conforme a la *Final Rule* de la EPA y al Reglamento Núm. 2863, el campo fue ocupado. No le asiste la razón.

 En primer lugar, tal y como discutimos anteriormente, del texto claro promulgado por la EPA en 2015, leído en su totalidad, se desprende que la intención expresa de esta agencia fue establecer únicamente aquellos criterios nacionales mínimos para disponer de los residuos de combustión de carbón. Así, explícitamente se establece que las disposiciones de la *Final Rule* no impiden que un estado promulgue requisitos más exigentes que los establecidos por la EPA, según así lo considere. Véase 80 Fed. Reg. 21430 (*"The federal criteria promulgated today are minimum requirements and do not preclude States from adopting more stringent requirements where they deem to be appropriate"*). Siendo ello así, no existe duda en torno a la clara intención de la EPA de permitir a los estados promulgar y adoptar aquellas regulaciones que estimen nece-

sarias para atender lo relacionado con la disposición de residuos de combustión de carbón. Nos resulta inescapable, pues, concluir que la EPA no ocupó el campo en cuanto a este asunto.

Por otra parte, Ecosystems arguye que el Reglamento Núm. 2863 aprobado por la JCA y las subsiguientes enmiendas al mismo tuvieron el efecto de que esa agencia administrativa ocupara el campo relativo a los residuos de combustión de carbón. Nuevamente, no le asiste la razón.

De una lectura íntegra del Reglamento Núm. 2863, junto a sus respectivas enmiendas se desprende que, en esencia, el mismo se limita a atender únicamente aquellos aspectos técnicos y administrativos relativos a las actividades que se llevan a cabo en las instalaciones de desperdicios sólidos. Es decir, se atiende cómo habrá de realizarse, una vez permitida la construcción de una facilidad de esta índole, el manejo, monitoreo, almacenamiento y disposición de los desperdicios sólidos. Nada se dispone en torno al uso de materiales de construcción.

 Así pues, la JCA, entidad a la cual se le concedió, entre otras, la facultad de adoptar normas o reglamentos relacionados con la disposición de desperdicios sólidos y a los permisos y las licencias para la ubicación de instalaciones para la recuperación, el procesamiento y la disposición final de tales desperdicios, *tampoco, hasta hoy, ha ocupado el campo en cuanto al uso de agregado manufacturado a base de cenizas de la quema de carbón como material de construcción.* Nada impide que, posteriormente, la JCA ejerza su poder de reglamentación en cuanto a este asunto y ocupe expresamente el campo.

 En vista de lo anterior, el Municipio está facultado para regular o prohibir el uso y manejo de agregado manufacturado a base de cenizas producto de la quema de carbón dentro de sus límites territoriales, pues no ha contravenido la política pública del Estado, según delineada por la JCA. Véanse: Ley sobre Política Pública Ambiental,

12 LPRA sec. 8001(a); Art. 2.005 de la Ley de Municipios Autónomos, 21 LPRA sec. 4055; *AES Puerto Rico, L.P. v. Trujillo-Panisse*, supra, pág. 428 (*"Puerto Rico law permits municipalities to 'regulate the solid waste collection management in harmony with the environmental policy' of the Commonwealth"*).

Conforme a las disposiciones de la Ordenanza Municipal, cualquier persona o entidad jurídica queda facultada para utilizar, dentro de Peñuelas, cualquier otro tipo de material de construcción o relleno para cumplir con un plan de construcción. Tal es el caso de Ecosystems. *Su derecho a construir un vertedero o un sistema de relleno sanitario no queda afectado en modo alguno por la Ordenanza Municipal ni por la decisión que hoy pronuncia este Tribunal.* Cualquier contención en contrario no encuentra sustento alguno en derecho.

Así las cosas, en vista de lo expuesto, resolvemos que la Ordenanza Municipal aprobada por el Municipio que prohíbe el uso de cenizas procedentes de la quema de carbón en plantas generadoras de energía como material de relleno es válida y oponible a Ecosystems, pues no contraviene la política pública del Estado Libre Asociado vigente ni el permiso de construcción que emitieron la JCA y la OGPe.

Establecido lo anterior, solo nos resta determinar si la referida Ordenanza Municipal es de aplicación específica a Ecosystems, por lo cual se le debía notificar por escrito y correo regular y certificado, para que comenzara a transcurrir el término de veinte días para su impugnación, o si, por el contrario, era de aplicación general. Veamos.

## VI

Como se sabe, la Ley de Municipios Autónomos establece la forma en la que las ordenanzas y resoluciones de un municipio cobran eficacia. Asimismo, establece el meca-

nismo que se debe incoar en caso de que se intente revisar alguna actuación legislativa municipal. A tales efectos, el Art. 15.002 de la Ley de Municipios Autónomos dispone, en lo aquí pertinente, de la manera siguiente:

(1) El Tribunal de Primera Instancia de Puerto Rico entenderá y resolverá[,] con exclusividad, a instancias de la parte perjudicada, sobre los siguientes asuntos:

(a) Revisar cualquier acto legislativo o administrativo de cualquier funcionario u organismo municipal que lesione derechos constitucionales de los querellantes o que sea contrario a las leyes de Puerto Rico.

(b) Suspender la ejecución de cualquier ordenanza, resolución, acuerdo u orden de la legislatura, del alcalde o de cualquier funcionario del municipio que lesione derechos garantizados por la Constitución del Estado Libre Asociado de Puerto Rico o por las leyes estatales.

(c) Compeler el cumplimiento de deberes ministeriales por los funcionarios del municipio.

(d) Conocer, mediante juicio ordinario, las acciones de reclamaciones de daños y perjuicios por actos u omisiones de los funcionarios o empleados del municipio por malicia, negligencia e ignorancia inexcusable.

En los casos contemplados bajo las (a) y (b) de este inciso, *la acción judicial sólo podrá instarse dentro de los veinte (20) días siguientes a la fecha en que el acto legislativo o administrativo se haya realizado o que la ordenanza, resolución, acuerdo u orden se haya notificado por el alcalde o funcionario municipal autorizado a la parte querellante por escrito mediante copia y por correo regular y certificado a menos que se disponga otra cosa por ley.* Disponiéndose, que el término de veinte (20) días establecido en esta sección comenzará a decursar a partir del depósito en el correo de dicha notificación; y que la misma deberá incluir, pero sin ser limitativo, el derecho de la parte afectada a recurrir al Tribunal de Primera Instancia, Sala Superior competente; término para apelar la decisión; fecha del archivo en auto[s] de la copia de la notificación y a partir de qué fecha comenzará a transcurrir el término. (Énfasis suplido). 21 LPRA sec. 4702.

Así, pues, la Ley de Municipios Autónomos establece un término de caducidad de veinte días para impugnar cualquier ordenanza, resolución o acuerdo de la Legislatura Municipal o de cualquier funcionario del municipio,

ante el Tribunal de Primera Instancia. Tratándose de un término de caducidad, el mismo no permite interrupción, de modo que se logre impartir certeza y finalidad a las actuaciones del gobierno municipal. *Hardland Co. v. Mun. de San Juan*, 139 DPR 185, 189–190 (1995); *Acevedo v. Asamblea Mun. San Juan*, 125 DPR 182 (1990).

Según se infiere, el transcurso del término de caducidad para impugnar tales actuaciones dependerá de si la ordenanza, resolución o acuerdo municipal es de aplicación general o específica. Si su aplicación es general, se deduce que el término comenzará a transcurrir al día siguiente a la fecha de la actuación legislativa o administrativa. *Hardland Co. v. Mun. de San Juan*, supra; *Acevedo v. Asamblea Mun. San Juan*, supra. Por otra parte, cuando la ordenanza, resolución o acuerdo municipal es de aplicación específica, el término de caducidad se entiende que ha comenzado a transcurrir desde la notificación a la parte afectada por tal actuación. *Íd.*

En el presente caso, Ecosystems sostiene que la Ordenanza Municipal aprobada por el Municipio es de aplicación individual y específica, por lo que el Municipio estaba obligado a notificarle por escrito y por correo, regular y certificado, de tal actuación. Por ello, entiende que el término de caducidad de veinte días para impugnar tal acto legislativo no ha comenzado a transcurrir. Tras evaluar las disposiciones legales aplicables y el tracto procesal de este caso, resolvemos que no le asiste la razón.

El texto de la Ordenanza Municipal explícitamente establece que aplica a "*[t]odo desarrollador, constructor, compañía y/o cualquier persona jurídica o natural*" que vaya a realizar un proyecto de construcción en el Municipio o deposite relleno a base de cenizas procedentes de la quema de carbón para producir energía. (Énfasis suplido). Ordenanza Municipal, págs. 2 y 3, en Apéndice del *Certiorari*, págs. 92–93. Es decir, *no podemos colegir que la misma*

*aplica exclusivamente a Ecosystems*. Por el contrario, la misma aplica a cualquier compañía, presente o futura, que desee depositar o realizar un proyecto de construcción mediante la utilización de agregado manufacturado proveniente de la quema de carbón. Disponer lo contrario sería contravenir la intención clara del legislador municipal, según quedó plasmada en el texto aprobado por la Legislatura Municipal de Peñuelas y su alcalde.

Como cuestión de hecho, en el caso ante nuestra consideración, Ecosystems parte de la premisa errada de tener a su favor un derecho propietario para el uso de *Agremax*, lo que automáticamente provocó que la Ordenanza Municipal fuera de aplicación específica. Nada más lejos de la verdad. Aquí, la JCA expidió un permiso de construcción a favor de Ecosystems, que nada disponía en cuanto al uso de *Agremax* en sus instalaciones. Luego, el Municipio aprueba la Ordenanza Municipal que prohíbe únicamente el uso de cenizas procedentes de la quema de carbón como material de construcción o relleno en las instalaciones, y que, a su vez, acepta cualquier otro material. Es con posterioridad a la aprobación y entrada en vigencia de tal ordenanza, un año y varios meses después, que Ecosystems solicita y obtiene a su favor un permiso enmendado que tampoco lo autorizó expresamente a utilizar *Agremax* en la instalación que se construiría en Peñuelas.

Así las cosas, debido a que la Ordenanza Municipal en cuestión es de aplicación general, el término para impugnarla comenzó a transcurrir al día siguiente de entrar en vigor. Como transcurrió más de un año antes de que Ecosystems la impugnara, el término establecido en la Ley de Municipios Autónomos caducó. Así, pues, se cometió el error señalado.

Precisa reiterar que lo aquí resuelto por este Tribunal no es óbice para que, de así entenderlo y conforme a los mecanismos provistos en ley, la JCA establezca la política pública del Estado Libre Asociado sobre este asunto.

## VII

Por los fundamentos expuestos, por entender que el asunto relativo al uso de cenizas procedentes de la combustión de carbón no ha sido ocupado por el gobierno federal o estatal, y que el Municipio posee la facultad en ley para prohibir su uso dentro de sus límites territoriales, *revocamos la determinación del Tribunal de Apelaciones y reinstalamos la sentencia emitida por el Tribunal de Primera Instancia. Notifíquese inmediatamente por correo electrónico y, posteriormente, por la vía ordinaria.*

*Se dictará sentencia de conformidad.*

La Juez Asociada Señora Rodríguez Rodríguez concurrió con una opinión escrita. La Jueza Presidenta Oronoz Rodríguez y la Jueza Asociada Señora Pabón Charneco concurrieron sin opinión escrita. El Juez Asociado Señor Kolthoff Caraballo no intervino.

## — O —

Opinión concurrente emitida por la Juez Asociada Señora Rodríguez Rodríguez.

Estoy conteste con resolver que la Ordenanza Municipal aprobada por el Municipio Autónomo de Peñuelas —prohibiendo el uso del agregado manufacturado *Agremax* como material de construcción o relleno— es válida y, consecuentemente, oponible a Ecosystems, Inc. No obstante, preciso abundar sobre el contenido del Permiso General Consolidado Enmendado y puntualizar sobre ciertos eventos que no se desprenden de la opinión mayoritaria.

## I

Tal y como narra la opinión mayoritaria, la presente controversia surge del Permiso General Consolidado (PGC)

expedido, el 25 de marzo de 2013, por la Oficina de Gerencia de Permisos (OGPe) y la Junta de Calidad Ambiental (JCA) a favor de Ecosystems, Inc. (Ecosystems). Éste fue otorgado para la construcción de un vertedero comercial en el barrio Encarnación del municipio de Peñuelas (Municipio o peticionaria). De una lectura del PGC surge que Ecosystems no estaba autorizado a utilizar relleno en su construcción.[1]

Por su parte, la Asamblea Legislativa del Municipio aprobó la Ordenanza Núm. 13, serie 2012–2013 (Ordenanza Municipal) el 9 de abril de 2013, efectiva el día siguiente, prohibiendo el uso de cenizas procedentes de la quema de carbón de plantas generadoras de energía, específicamente Agremax, como material de relleno o construcción.

La opinión mayoritaria menciona que la construcción del vertedero fue inspeccionada por el personal de la JCA. Sin embargo, considero que es preciso pormenorizar los hallazgos y el procedimiento administrativo que surgieron de tal evento, pues estos hechos son necesarios para la cabal comprensión del contenido de la enmienda que Ecosystems solicitó al PGC. Así, pues, el 6 de mayo de 2014 acaeció la referida inspección. Allí, los ingenieros identificaron varias violaciones al PGC y al Reglamento para el Control de la Erosión y Prevención de la Sedimentación, Reglamento Núm. 5754 de la Junta de Calidad Ambiental de 12 de febrero de 1998, según enmendado (RCEPS). Entre las violaciones, se encontró que Ecosystems se extralimitó de las facultades autorizadas en el PGC al rellenar ciertas áreas para la construcción de una vía de acceso al vertedero. Los materiales utilizados como relleno para la construcción de la carretera fueron agregado manufacturado Agremax y mogolla.[2] En consecuencia, el Oficial Examinador reco-

---

[1] En el apartado *Componentes de la corteza terrestre, Volumen total a rellenar*, el Permiso General Consolidado indica *cero metros cúbicos*.

[2] Según la determinación de hecho núm. 13 del Informe del Oficial Examinador de 29 de mayo de 2014: "La señora Figueroa Andino [ingeniera que inspeccionó las instalaciones de Ecosystems] revisó las boletas de pasaje del material que se

mendó la imposición de una multa de $10,000 a Ecosystems por haber rellenado ilegalmente.([3])

En vista de ello, el 18 de junio de 2014 Ecosystems acudió a la OGPe y la JCA para solicitar la modificación del PGC y poder utilizar el agregado manufacturado como relleno en las instalaciones a ser construidas. El 25 de junio de 2014 se expidió la enmienda al permiso (PGC Enmendado) que autorizó el relleno para un volumen total de 70 mil metros cúbicos. La especificidad de los materiales que se utilizaría como relleno lo dispuso el Memorial Explicativo, documento sometido por el propio Ecosystems. De éste surge que se utilizará agregado manufacturado o mogolla como material de relleno.([4]) Véase Memorial Explicativo, pág. 1, en Apéndice del *Certiorari*, pág. 154.

El Municipio —tras conocer sobre la utilización de Agremax en el proyecto de Ecosystems— presentó, el 18 de agosto de 2014, una demanda en solicitud de un interdicto preliminar y permanente. En síntesis, alegó que Ecosystems violó la Ordenanza Municipal. Luego de varios incidentes procesales, el Tribunal de Primera Instancia (TPI) emitió una Orden de Entredicho Provisional y ordenó a Ecosystems que desistiera de cualquier uso de Agremax en el Municipio hasta que se dispusiera de otra forma. Durante la vista, Ecosystems presentó una solicitud de deses-

---

estaba utilizando para la construcción del camino de acceso al proyecto. Según la información contenida en las mismas, los materiales consistían en el agregado de cenizas de carbón conocido como 'Agremax', generado por la planta de generación de electricidad que usa carbón como combustible, Applied Energy Systems Puerto Rico, L.P., ubicada en Guayama; y mogolla de relleno de la corteza terrestre proveniente de la cantera Rita. Véase Informe del Oficial Examinador, Caso Núm. OA-14-RP-044-A, Junta de Calidad Ambiental, pág. 13, en Apéndice del *Certiorari*, págs. 105–106.

([3]) La Regla 1220(B) del Reglamento para el Control de la Erosión y Prevención de la Sedimentación dispone que "[n]inguna persona podrá efectuar cambio alguno a un permiso CES previamente aprobado por la Junta de Calidad Ambiental, incluyéndose todos los documentos y planos que forman parte del mismo, según radicado, sin la previa autorización de la Junta de Calidad Ambiental, excepto conforme a lo establecido en el Inciso F de la Regla 1230 de este Reglamento". Reglamento Núm. 5754 de la Junta de Calidad Ambiental de 12 de febrero de 1998, según enmendado, pág. 18.

([4]) El Memorial Explicativo menciona que el volumen final de la carretera ya construida con agregado manufacturado y mogolla se estima en, aproximadamente, 35,000 metros cúbicos. Apéndice del *Certiorari*, pág. 154.

timación bajo el fundamento de que la Ordenanza Municipal era *ultra vires* y, por lo tanto, nula. Esto, al entender que las entidades con "jurisdicción exclusiva" para regular lo relativo a los desperdicios sólidos son la Agencia para la Protección Ambiental (EPA) y la JCA. Este razonamiento se basó en que el campo fue ocupado en virtud del *Hazardous and Solid Waste Management System; Disposal of Coal Combustion Residuals from Electric Utilities*, 80 Fed. Reg. 21302 (17 de abril de 2015), y el Reglamento para el control de los desperdicios sólidos peligrosos y no peligrosos, según enmendado, Reglamento Núm. 2863 de la Junta de Calidad Ambiental. Además, Ecosystems arguyó que la Ordenanza Municipal afectó sus derechos propietarios y al debido proceso de ley.

Finalmente, el 18 de septiembre de 2014, el TPI declaró "con lugar" la demanda incoada por el Municipio y ordenó a Ecosystems el cese y desista de la utilización de Agremax. El foro primario concluyó que la Ordenanza Municipal es de aplicación general y no interfiere de forma alguna con el Permiso General Consolidado relativo a la construcción de un vertedero.

Inconforme con tal determinación, Ecosystems apeló ante el Tribunal de Apelaciones (TA). Allí arguyó nuevamente la nulidad de la Ordenanza Municipal y la violación a su debido proceso de ley, puesto que la aplicación del pronunciamiento municipal es específica y no general.

Por su parte, el Municipio alegó que la JCA no ha regulado el uso de Agremax, por lo que la ordenanza en cuestión es complementaria a las disposiciones regulatorias de las agencias que atienden el asunto de desperdicios sólidos. Asimismo, el Municipio alegó que la ordenanza es válida al no contravenir la legislación estatal. Además, al ser de aplicación general, Ecosystems estaba obligada a impugnar el precepto municipal dentro del término de caducidad de veinte días que dispone la Ley de Municipios Autónomos. Véase Art. 15.002 de la Ley de Municipios Au-

tónomos del Estado Libre Asociado de Puerto Rico de 1991, Ley Núm. 81-1991 (21 LPRA sec. 4702).

El foro apelativo intermedio dictó una sentencia revocando en su totalidad la Orden de Injunction Permanente emitida por el foro primario. Además, determinó que aunque la aplicación de la ordenanza era "teóricamente" general, "su efecto real es de aplicación particular a Ecosystems", siendo esta última afectada. (Énfasis suprimido). Apéndice del *Certiorari*, pág. 28. Consecuentemente, el TA determinó que el término de caducidad para impugnar la actuación municipal no había comenzado a transcurrir.

Aún insatisfecho, el Municipio acudió oportunamente ante este Tribunal mediante un auto de *Certiorari*. En el recurso apelativo planteó que erró el foro apelativo intermedio al concluir que la Ordenanza Municipal era de aplicación específica a Ecosystems. Tal determinación tuvo el efecto de concluir que el término de caducidad para impugnar la actuación del municipio comenzaría a transcurrir a partir de la notificación por correo de la Ordenanza dirigida a Ecosystems.

En su alegato de oposición, Ecosystems repitió sus alegaciones en cuanto a la aplicación específica de la Ordenanza Municipal y su nulidad.

II

La mayoría de este tribunal atiende el efecto de la Ordenanza Municipal sobre el permiso otorgado a Ecosystems como limitado a la autorización para construir el vertedero comercial obviando el permiso enmendado. No obstante, considero que Ecosystems posee, válidamente, un permiso de construcción y uso de agregado manufacturado como material de relleno. Veamos.

Como fue señalado en los hechos, el PGC nada dispuso sobre la acción de rellenar en la construcción del vertedero comercial. Posteriormente, Ecosystems solicitó una en-

mienda al PGC para que se le autorizara a rellenar 70,000 metros cúbicos con material agregado manufacturado o mogolla.

No debemos pasar por alto que tal enmienda fue aprobada por las agencias pertinentes y —que hasta el momento— está vigente. Ecosystems, por lo tanto, posee una autorización válida para utilizar en su construcción el agregado manufacturado o mogolla como material de relleno. Por otra parte, es necesario mencionar que es norma reiterada que los procesos administrativos están revestidos de una presunción de corrección y regularidad. *González Segarra et al. v. CFSE*, 188 DPR 252, 277 (2013); *Calderón Otero v. C.F.S.E.*, 181 DPR 386 (2011); *JP, Plaza Santa Isabel v. Cordero Badillo*, 177 DPR 177 (2009).

Ahora bien, debo aclarar que coincido con el análisis de la opinión mayoritaria respecto a que el Municipio está facultado para regular el manejo de desperdicios sólidos y, en vista de que no existe reglamentación federal o estatal relacionada al uso de las cenizas como material agregado para relleno, es válida la Ordenanza Municipal. No obstante, este Tribunal debió precisar la controversia siguiente: ¿cuál es el efecto de la Ordenanza Municipal en el permiso que autoriza a Ecosystem a utilizar el agregado manufacturado como material de relleno en la construcción del vertedero comercial? Para aclarar esto, como cuestión de umbral, es menester clarificar qué es un agregado manufacturado y cómo se cataloga el producto Agremax.

Los agregados, al igual que los materiales de construcción en general, son considerados "componentes importantes de una infraestructura".[5] Actualmente, existen agregados naturales y agregados reciclados. Las principales fuentes de agregados naturales son las rocas, la arena y la

---

[5] D. Wilburn y T. Goonan, "Aggregates from Natural and Recycled Sources: Economic Assessments for Construction Applications", Structure of the Aggregates Industry, 1998, pág. 3, http://cimentquebec.com/wp/wp-content/uploads/2011/12/Recycled-Aggregates-Study.pdf (última visita, 14 de diciembre de 2016).

grava.(⁶) Sin embargo, ante el exponencial desarrollo urbanístico y el impacto ambiental que producen las excesivas extracciones de estos recursos naturales, se han desarrollado agregados que, mediante la manufactura, se confeccionan del reciclaje de materiales como los escombros de las demoliciones de estructuras, del pavimento removido y, en lo pertinente a este caso, las cenizas provenientes de la quema de carbón.(⁷)

Por su parte, el Agremax es un producto manufacturado por AES Puerto Rico, empresa que lo describe como un material de relleno compuesto por materiales reciclados, entiéndase, las cenizas provenientes de la combustión de carbón.(⁸) Según lo antes discutido, queda claro que el Agremax es un tipo de agregado manufacturado.

Así, pues, retomando el lenguaje del PGC Enmendado, es innegable que la autorización para rellenar con agregado manufacturado se emitió en la acepción genérica o amplia del concepto, por lo que, potencialmente, incluiría material de relleno proveniente de las cenizas. Ahora bien, para cumplir con la reglamentación municipal, Ecosystems tiene que cerciorarse que el material agregado que utilizará sea permitido en el Municipio. Como vimos, la Ordenanza Municipal únicamente prohíbe un producto dentro de la gama de agregados manufacturados existentes, a saber, las provenientes de las cenizas.(⁹)

Con esto en mente, es forzoso concluir que la Ordenanza Municipal no incide en el ejercicio de Ecosystems de rellenar con agregado manufacturado. Es decir, Ecosystems puede utilizar cualquier agregado manufacturado como material de relleno, siempre y cuando no sea el agregado

---

(⁶) Íd.

(⁷) Íd.

(⁸) Agremax, AES Puerto Rico, http://aespuertorico.com/productos/ (última visita, 12 de diciembre de 2016).

(⁹) Según la Ordenanza Municipal, se prohíbe el uso de "cenizas derivadas de la quema de carbón como material de construcción o relleno, llámese AGREMAX o con cualquier otro nombre comercial". Apéndice del *Certiorari*, Sección 2da, pág. 92.

proveniente de cenizas de la quema de carbón, llámese Agremax o cualquier otro nombre comercial, dentro de los límites geográficos del Municipio. De esta forma procuramos, *ante estos hechos*, armonizar las facultades de reglamentación del Municipio con el poder de razón del Estado, como ordena la Ley de Municipios Autónomos.[10]

### III

En consideración de lo anterior, concurro con la opinión mayoritaria que emite este Tribunal.

---

[10] Hacemos la salvedad, al igual que lo hace la Opinión del Tribunal, que la Junta de Calidad Ambiental (JCA) puede, como asunto de política pública del Estado, regular el uso de agregados, incluso, las cenizas provenientes de la quema de carbón. La determinación que tome la JCA sobre este particular, necesariamente, debe prevalecer sobre los dictámenes municipales. Lo contrario sería darle paso a la balcanización del Estado.