Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
Panel Especial

| | | |
|---|---|---|
| THE JOINT VENTURE OF F&R – BLDM, ET ALS<br>Apelados<br><br><br>v.<br><br><br>MUNICIPIO AUTÓNOMO DE FAJARDO, ET ALS<br>Apelante | KLAN202400242<br><br>consolidado con<br><br>KLAN202400341<br>KLAN202400343 | Apelación procedente del Tribunal de Primera Instancia Sala de San Juan<br><br>Caso Núm. SJ2020CV01065<br><br>Sobre: Impugnación de Imposición de Arbitrios de Construcción; Sentencia Declaratoria |

Panel integrado por su presidente, el Juez Bermúdez Torres, el Juez Adames Soto y el Juez Rivera Torres[1]

Adames Soto, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de agosto de 2024.

Comparecen el Municipio Autónomo de Fajardo (el Municipio), Joint Venture of F&R-BLDM (Joint Venture), y el Departamento de la Vivienda, mediante sus respectivos escritos de apelación KLAN202400242, KLAN202400343, y KLAN202400341, los cuales ordenamos consolidar. Todos solicitan la revisión de una misma *Sentencia,* emitida por el Tribunal de Primera Instancia, (TPI), el 27 de diciembre de 2023. En esencia, habiendo cuestionado Joint Venture la capacidad del Municipio para cobrarle ciertos arbitrios de construcción, mediante el referido dictamen el Foro primario determinó que los trabajos de reparación que el primero llevó a cabo en el Municipio bajo el proyecto *Tu Hogar Renace* (THR): (1) sí están sujetos al pago de arbitrios de construcción; (2) pero el Municipio no

---

[1] Mediante Orden Administrativa OATA-2024-036 se designó como integrante de Panel al Hon. Waldemar Rivera Torres debido a la inhibición de la Hon. Waleska I. Aldebol Mora.

cumplió su responsabilidad de reclamarlos y exigirlos dentro del término que la ley establece para ello, por lo que estaba impedido de recobrarlos.

Por los fundamentos que más adelante explicaremos, revocamos el dictamen apelado.

## I.       Resumen del tracto procesal

Tras el paso de los de los huracanes Irma y María por Puerto Rico en septiembre de 2017, la Agencia Federal para el Manejo de Emergencias (FEMA), implementó el *Sheltering and Temporary Essential Power Pilot Program* (STEP), que fue administrado en Puerto Rico por el Departamento de la Vivienda (Dpto. de la Vivienda), bajo el nombre *Tu Hogar Renace,* (THR). Con el propósito de realizar trabajos autorizados bajo STEP, el 6 de noviembre de 2017, el Dpto. de la Vivienda emitió un *Aviso de Subasta sobre el Requerimiento de Propuestas número DOH-RFP-17-18-03.* Como resultado de la celebración de dicha subasta, el contratista Joint Venture fue seleccionado para ejecutar los trabajos relativos a la misma en el Municipio.

Siendo el licitador agraciado, el 11 de enero de 2018, Joint Venture firmó el *Contract for Construction Repair Work DOH-RFP-17-18-03,* (*el Contrato*) con el Dpto. de la Vivienda. En este contrato el Municipio no participó como parte suscribiente, ni de manera alguna.

Al próximo mes, el 26 de febrero de 2018, Joint Venture le cursó una misiva al Municipio indicándole, entre otros: (1) que solicitaba la patente provisional de construcción y; (2) que en *el Contrato* se había estipulado que estaba exento de pagar de arbitrios de construcción al Municipio, y de obtener los permisos de la Oficina de Gerencia de Permisos (OGPe).

Con referencia a la solicitud de patente de construcción aludida, el 3 de octubre de 2019, Joint Venture, declaró bajo juramento que el

volumen final certificado por el Dpto. de la Vivienda era de $16,449,330.61.

Pasado más de un año de lo anterior, el 16 de enero de 2020, el Municipio le notificó a Joint Venture una *deficiencia preliminar* por concepto de arbitrios de construcción. En esencia, el Municipio aseveró en dicha misiva que la cláusula del Renglón 1(A) del *Contrato,* donde se dispuso que Joint Venture se encontraba eximido del pago de arbitrios de construcción, era contraria al Art. 2.002 de la Ley de Municipios Autónomos (LMA o Ley Núm. 81-1991), 21 LPRA sec. 4052, y a la Ordenanza Núm. 25 Serie 2010-2011. Por esto, al Joint Venture haber realizado obras de construcción dentro de los límites territoriales del Municipio, sin haber pagado de los arbitrios correspondientes, se le estaba imputando la *deficiencia preliminar* indicada de $1,052,757.16. A su vez, el Municipio señaló que el valor de la construcción fue tomado de la declaración jurada del 3 de octubre de 2019 presentada por Joint Venture, a que se hizo referencia en el párrafo que precede.

A raíz de ello, 31 de enero de 2020, Joint Venture solicitó al Municipio una reconsideración de la referida deficiencia preliminar, con la celebración de una vista administrativa. Adujo que las obras llevadas a cabo no eran susceptibles del cobro de arbitrios reclamado por el Municipio, pues no constituían una *actividad de construcción,* según esta era definida por el Art. 1.003 (dd) de la Ley Núm. 81-1991, 21 LPRA Sec. 4001 (dd). Sobre esto abundó, que había que llegar a tal conclusión por causa de la naturaleza *temporera* de los trabajos realizados sobre las unidades elegibles bajo el programa STEP. Es decir, según Joint Venture, los trabajos realizados fueron reparaciones menores que no constituían *actividad de construcción* para fines de la ley citada. Sugirió, en la alternativa, que se hiciera un desglose de las actividades por tarea para determinar cuáles constituían actividades de construcción y cuáles no.

Esto, pues, entre las tareas que le fueron asignadas se encontraba suplir neveras, plantas eléctricas microondas, limpieza, etc.[2] Además, sostuvo que estaban exentas del pago de arbitrios las ganancias del contratista, los costos de transportación, y de adquisición de equipos. El 4 de febrero de 2020, Joint Venture reiteró su solicitud de vista administrativa.

A pesar de dar inicio al proceso administrativo ante el Municipio, a su vez, el 6 de febrero de 2020, Joint Venture presentó ante el TPI *Demanda sobre sentencia declaratoria.* En lo pertinente, solicitó que se dejara sin efecto la deficiencia preliminar emitida por el Municipio, aduciendo que fue impuesta sin autoridad de ley. En particular, adujo que los trabajos que realizó bajo el programa THR y STEP, eran reparaciones de emergencia, de naturaleza temporera, que se encontraban fuera de la definición *actividad de construcción* tributable. También, impugnó la notificación de la deficiencia, arguyendo que fue defectuosa, contraria al debido proceso de ley. Solicitó en la alternativa, que se dejara sin efecto la deficiencia preliminar, por sobrestimar el *costo total* de la construcción, al no aplicar las deducciones provistas por la Ley Núm. 81-1991 y la jurisprudencia aplicable.

En la referida demanda Joint Venture también acumuló como parte demandada al Dpto. de la Vivienda, alegando que este le había representado que la obra estaría exenta del pago de arbitrios de

---

[2] Asimismo, la carta fue acompañada por el Exhibit I intitulado *Listado de Procedimiento para la Inspección Final V6.0* del Dpto. de la Vivienda. Entre el tipo de obras a realizarse y que debían ser inspeccionadas se incluyeron: remoción de escombros, limpiar y desinfectar, control de plagas, reemplazo de líneas de gas propano, reinstalación de lavamanos y fregaderos, instalación de duchas, instalación de calentador de agua, reparación de bomba del pozo de agua, instalación de cisterna, reemplazo de bomba eyectora de aguas negras, entrega de enseres electrodomésticos, prueba e inspección del sistema eléctrico, remplazo de detector de humo y monóxido de carbono, instalación de rampa para discapacitados, reparación de acceso al balcón, reparación de enmarcado "framing" para reparaciones misceláneas, reemplazo de puertas y ventanas, remoción e instalación de paneles "gypsom board", instalación de gabinetes, remoción de revestimiento del piso, limpiar, remover material suelto del techo y aplicar cemento reforzado para corregir el estancamiento del agua, sellado de grietas de exteriores, reparación de techo de metal corrugado "zinc", reparación de cubiertas de lona (toldos azules), entre otros. Apéndice del recurso de Apelación del Municipio de Fajardo, págs. 28-40.

construcción. En consecuencia, solicitó como remedio que se dictara una orden para que el Estado Libre Asociado de Puerto Rico (ELA), le pagara directamente al Municipio los arbitrios de construcción sobre los trabajos realizados bajo el programa THR y STEP.

De manera paralela, en el ámbito administrativo iniciado ante el Municipio, el 12 de marzo de 2020, este acogió lo solicitud de vista administrativa que había presentado Joint Venture, señalándola para el 7 de mayo de 2020. No obstante, llegada la fecha pautada para celebrar la vista administrativa, no se pudo llevar a cabo, por lo que el 9 de julio de 2020, el Municipio le solicitó a Joint Venture que sugiera tres fechas disponibles en agosto 2020 para tal fin.

Regresando al proceso iniciado ante el TPI por Joint Venture, el 17 de julio de 2020, el Municipio presentó ante dicho foro una *Moción en Solicitud de Desestimación por Falta de Jurisdicción sobre la Materia por Falta de Agotamiento del Trámite Administrativo.* En síntesis, informó al Tribunal del proceso administrativo iniciado por Joint Venture ante el Municipio sobre la misma controversia, que no había concluido, por lo que la jurisdicción correspondía a dicho cauce.

A los días siguientes, el 20 de julio de 2020, en el trámite administrativo, Joint Venture le remitió una carta al Municipio, aduciendo que este había perdido la jurisdicción para dilucidar la controversia sobre la deficiencia preliminar de arbitrios de construcción, tras la presentación de la demanda ante el TPI.

En respuesta, el 7 de agosto de 2020, el Municipio le notificó una comunicación a Joint Venture, subrayando que ya se había activado el trámite administrativo, por lo que el foro que carecía de jurisdicción era el judicial, no el administrativo. Acorde con tal conclusión, el Municipio señaló vista para el 27 de agosto de 2020.

Entretanto, en el pleito ante el Tribunal, el 20 de agosto de 2020, Joint Venture instó su *Oposición a Desestimación Solicitada por el Municipio de Fajardo y Solicitud Urgente en Auxilio de Jurisdicción*.

En respuesta, el 24 de agosto de 2020, el TPI dictó una *Orden* de paralización de los procedimientos administrativos pendientes ante el Municipio.

Insatisfecho, el 8 de septiembre de 2020, el Municipio solicitó al foro primario reconsideración sobre la referida *Orden* de paralización, y el 17 de septiembre de 2020, presentó una *Réplica del Municipio de Fajardo a la Oposición del Demandante a la Solicitud de Desestimación por Falta de Jurisdicción*.

Por otra parte, el 23 de septiembre de 2020, el Dpto. de la Vivienda compareció ante el TPI, solicitándole que decretara que el Municipio estaba impedido de imponerle los arbitrios municipales de construcción reclamados a Joint Venture.

El 8 de octubre de 2020 Joint Venture presentó *Dúplica a la Réplica del Municipio de Fajardo y Oposición a Solicitud de Reconsideración de Orden del 24 de agosto de 2020*.

Tras varios trámites procesales, el 11 de enero de 2023, el tribunal *a quo* emitió *Resolución* declarando *No Ha Lugar* la *Solicitud de Desestimación* presentada por el Municipio.[3]

A los pocos días, el 20 de enero de 2023, compareció el Municipio ante el TPI, mediante *Contestación del Municipio de Fajardo a la Demanda*, reiterando su solicitud para que se desestimara la demanda instada por Joint Venture, por falta de jurisdicción. Con todo, el 23 de enero de 2023, este también presentó *Contestación enmendada*. Esta vez añadió en su petitorio que se decretara que el Dpto. de la Vivienda no tenía facultad en ley para eximir, mediante contrato privado, del pago de arbitrios de

---

[3] Notificada el 12 de enero de 2023.

construcción a Joint Venture. Asimismo, le solicitó al foro *a quo* que dictaminara que los trabajos realizados por Joint Venture constituían *actividad de construcción*, según este concepto era definido por el Art. 1.003 (dd) de la Ley Núm 81-1991, 21 LPRA sec. 4001, por lo tanto, las actividades de construcción realizadas por la primera en el Municipio sí eran tributables.

Luego, el 11 de septiembre de 2023, el Municipio presentó una *Moción de sentencia sumaria*. Aquí afirmó que la única controversia ante la atención del TPI para dilucidar se reducía a determinar si el Municipio tenía la facultad en ley para imponerle a Joint Venture el pago de arbitrios por la por los trabajos de reparación realizados dentro de sus límites territoriales.

De manera similar, el 15 de septiembre de 2023, Joint Venture presentó un escrito intitulado *Solicitud de Sentencia Sumaria de la Parte Demandante y Oposición a la "Moción del Municipio Autónomo de Fajardo en Solicitud de Sentencia Sumaria"*.

Al próximo mes, el 27 de diciembre de 2023, el TPI emitió la *Sentencia* que dio origen a los recursos de apelación ante nuestra consideración. En lo referente a las determinaciones de hechos allí plasmadas, fueron enumeradas las siguientes como incontrovertidas:

1) El 18 de septiembre de 2017, mediante la emisión del Boletín Administrativo Núm. OE-2017-047, el Gobernador de Puerto Rico, Hon. Ricardo A. Rosselló Nevárez, declaró un estado de emergencia en todo Puerto Rico a consecuencia del paso inminente del Huracán María y el impacto que este pudiera generar.

2) Los días 19 y 20 de septiembre de 2017 El Huracán María azotó la Isla de Puerto Rico con vientos sostenidos en exceso de 150 millas por hora y lluvias torrenciales.

3) El Huracán María causó grandes pérdidas económicas, así como serios daños a la infraestructura, viviendas y el comercio en Puerto Rico.

4) El 20 de septiembre de 2017 el presidente de los Estados Unidos de América declaró a todo Puerto Rico como zona de

desastre mediante la Declaración de Desastre Mayor ("Major Disaster Declaration") Núm. DR-4339.

5) El Gobierno de Puerto Rico le delegó al Departamento de la Vivienda de Puerto Rico ("DVPR") la responsabilidad de administrar, mantener y operar viviendas provisionales de cualquier naturaleza para víctimas de emergencias o desastres que fueron trasladadas de sus casas a refugios temporeros.

6) El Gobierno de Puerto Rico le delegó al Departamento de la Vivienda ejecutar el programa "Tu Hogar Renace", bajo las disposiciones del programa federal conocido como "Sheltering and Temporary Essential Power Program" ("STEP") para hacer reparaciones menores de emergencia en residencias unifamiliares en residencias ocupadas por sus dueños.

7) Bajo el programa "Tu Hogar Renace" se procuraba, cuando fuera seguro y practicable, lograr que los residentes regresaran y permanecieran en sus hogares, mientras podían realizar las mejoras permanentes necesarias.

8) El programa "Tu Hogar Renace" incluyó trabajos de reparación que no podían sobrepasar los $20,000.00 (por cada unidad de vivienda); e incluyó, entre otras, mejoras temporeras dirigidas a: proveer energía eléctrica, incluso mediante un generador; reparación de cisternas y suplido de agua potable; sellado de techo; paredes y ventanas; asegurar o reemplazar puertas y ventanas; remoción de escombros; reparación de elementos de accesos como rampas y escaleras; remoción y reemplazo de pisos; asegurar un baño utilizable y facilidades de cocina; y asegurar dormitorios a todos los miembros del hogar.

9) El 4 de enero de 2018, y como resultado de los serios daños causados por el Huracán María, la Junta de Planificación de Puerto Rico, Oficina de Gerencia de Permisos (OGPe), emitió la Orden Administrativa 2018-01 mediante la cual dispuso que las siguientes obras no requerirán la expedición de un Permiso de Construcción por dicha agencia y/o Municipios Autónomos que cuenten con un convenio de transferencia de facultades delegando jerarquías conforme las disposiciones de la Ley 81-1991 – siempre y cuando no formen parte de otra obra o desarrollo mayor:

(a) Pintura de edificios o estructuras existentes;

(b) Sellado de techos;

(c) Trabajos de jardinería;

(d) Relleno de grietas, salideros, y goteras en el edificio o estructura;

(e) Enlucido (empañetado) en obras de hormigón existentes; y

(f) Instalación o cambio de losetas de piso, azulejos, cerámica o cualquier otra terminación de piso o pared.

10) El 6 de noviembre de 2017, el Departamento de la Vivienda emitió el Requerimiento de Propuestas (Request For Proposals) núm. DOH-RFP-17-18-03 para llevar a cabo los trabajos de reparación en viviendas que hubiesen sufrido daños como consecuencia del paso de los huracanes Irma y María.

11) En el AVISO DE SUBASTA (Requerimiento de Propuestas) se estableció lo siguiente:
"The GPR through the Department of Housing (DOH) desires to offer people displaced from their properties an option to return to their homes so they can shelter at their own homes under Section 403 of the Stafford Act for a Sheltering and Temporary Essential Power (STEP) Pilot Program to enable the GPR to perform minor emergency repairs in single family owner-occupied residences. The DOH is requiring qualified contractors to repair said properties so they can become habitable as shelters." (Énfasis nuestro.)

12) En el AVISO DE SUBASTA se aclaró lo siguiente en torno a la naturaleza de las reparaciones a llevarse a cabo bajo el programa STEP:

"STEP **is not** a comprehensive repair program and **will not result in the complete restoration of the dwelling.** The measures taken under this program are directed at preventing the progression of deterioration of the dwelling because of the passing of Hurricanes Irma and María and to **provide minimal steps necessary to render the dwelling safe and sanitary.** In order to be elegible under the STEP program, each home shall be habilitated for less than $20,000. This program reduces the demand for costlier shelter options and allows individuals to return to their homes." (Énfasis provisto). […]

"[…] Under STEP the DOH will contract directly with multiple construction firms capable of delivering *minor critical services* on a large scale and who possess or can obtain the resources required to deliver in an expedited manner." (Énfasis nuestro.)

13) El 11 de enero de 2018 la co-demandada, Departamento de la Vivienda ("DVPR") y The Joint Venture of F&R-BLDM ("JV") suscribieron un contrato titulado: CONTRACT FOR CONSTRUCTION REPAIR WORK – DOH-RPF-17-18-03 ("el contrato").

14) En el Contrato se describe de manera general la naturaleza de los trabajos a realizarse por JV y en lo pertinente dispone:

**IX. SCOPE OF WORK**

**Summary**

[...] The program also provides expedient and temporary repairs to protect the home from further weather-related damage. [...]

Exterior Work

• Any emergency repairs necessary to provide a weatherproofing structure are to be included, such as temporary roof, wall and window repairs. The intent is to provide absolute minimum repairs to prevent water intrusion. [...]

• Securing or replacing broken windows with minor carpentry or hardware repairs.

15) En el párrafo Sexto, Sección 1(A), del Contrato se incluyó el siguiente lenguaje:
"The repair work to be performed by the Contractor under the corresponding Task Orders is not subject to building permit requirements established forth by the Puerto Rico Permits Management Office ("OGPe", by its Spanish acronym), or to the payment of municipal excise taxes ("arbitrios de construcción")."

16) De la hoja utilizada para inspección de obras de reparación requerida por el DV, titulada "LISTADO DE PROCEDIMIENTO PARA LA INSPECCIÓN FINAL V6.0 DEL PROGRAMA TU HOGAR RENACE" surge lo siguiente:
• Artículo #140-reparación de la bomba de agua
• Artículo #37-rampa para discapacitados
• Artículo #38-reparación acceso de balcón
• Artículo #39-reparación de enmarcado "Framing"
• Artículo #45-remover paneles de yeso o "gypsum board"
• Artículo #46-instalación de paneles o "gypsum board"
• Artículo #51-remover revestimiento del piso
• Artículo #53-Sellado de techo con material poliuretano
• Artículo #54-reparación de techo de metal corrugado (ZINC)

17) Mediante carta fechada 26 de febrero de 2018, la firma de contables UHY Del Valle & Nieves, PSC, en representación y bajo autorización escrita del Joint Venture, solicitó al Municipio Autónomo de Fajardo ("MAF") que expidiera una *patente provisional de construcción* para que el Joint Venture pudiera: "*realizar el contrato de construcción del Departamento de la Vivienda, el cual provee los servicios de reparaciones por causa del Huracan María a unidades que constituyen primeras residencia a través del Programa "Tu Hogar Renace" o "Sheltering and Temporary Essential Power Program (STEP)" con fondos de FEMA*".

18) En torno al pago de **arbitrios de construcción**, en la carta del 26 de febrero de 2018 la firma de contables UHY Del Valle & Nieves, PSC, informó por escrito al Sr. Francisco Nazario, de la Oficina de Recaudaciones del Municipio Autónomo de Fajardo ("MAF") que: "*Este contrato* [*Contract for Construction Repair Work* – DOH-RFP-17-18-03] *estipula que el contratista*

[Joint Venture] *está exento del pago de los arbitrios de construcción y de los permisos de OGPe.*

19) En torno al pago de **patentes municipales**, en la carta del 26 de febrero de 2018 la firma de contables UHY Del Valle & Nieves, PSC, informó por escrito al MAF que:

(a) El contratista no tiene oficina en su municipio.
(b) El contrato se realizará en varios municipios y no se puede determinar la cantidad total de residencias a reparar por municipio ya que depende de las solicitudes al programa que cualifiquen.
(c) El contrato es hasta el 30 de junio de 2018; y
(d) Al finalizar el proyecto se le estaría pagando la patente al MAF, por ser el momento en que se podría determinar la cantidad total de volumen [de negocio] que se incurrió en cada municipio y que se podría certificar la terminación satisfactoria y sustancial del proyecto.

20) Entre el 2018 y el 2019, JV llevó a cabo trabajos de reparación de naturaleza temporera en múltiples unidades de vivienda ubicadas dentro de la jurisdicción del MAF.

(21) Los trabajos de reparación por el JV en el MAF ya habían comenzado desde antes de la presentación de la solicitud de *patente provisional* del 26 de febrero de 2018;

(22) Conforme a los términos del *Contrato*, el JV llevó a cabo inspecciones de unidades elegibles, en conjunto con personal asignado por DVPR. El propósito de las inspecciones era determinar el alcance de las reparaciones temporeras que serían necesarias para cada unidad de manera que las personas que habitan en la vivienda pudieran, con reparaciones temporeras mínimas, permanecer viviendo en la unidad, en lo que puedan ser relocalizados o reparar la unidad de manera permanente.

(23) Los trabajos de reparaciones temporeras llevados a cabo por JV bajo el *Contrato* incluyen, pero no están limitados a, la instalación de detectores de humos, alarmas de incendios, cisternas y refrigeradores de tamaño pequeño, reparaciones o sustituciones menores de puertas exteriores, ventanas exteriores y operadores de ventana, limpieza de paredes y pisos para sacar la humedad y hongo visibles, sellados de techo (con pintura sellante), la instalación de inodoros, fregaderos, gabinetes de cocina (de no más de cinco pies de largo), y calentador de agua, reemplazo de receptáculos o interruptores eléctricos, así como proveer un pequeño generador de electricidad portátil, estufa de gas o microondas pequeños, según las necesidades temporeras de cada residencia.

(24) Para el 26 de febrero de 2018, el JV ya tenía un número aproximado de las residencias a repararse; incluso ya había terminado y facturado varios de dichos trabajos.

(25) El 3 de octubre de 2019 el JV declaró (mediante *Declaración Jurada*) que, por sus trabajos bajo el *Contrato*, había tenido un volumen de negocios ascendente a $16,449,330.61 en el MAF.

(26) El 16 de enero de 2020, el MAF envió al JV una NOTIFICACIÓN DE DEFICIENCIA PRELIMINAR POR ARBITRIOS DE CONSTRUCCIÓN, vía correo certificado con acuse de recibo número 70190700000025822830.

(27) En su carta del 16 de enero de 2020 el MAF hace referencia a la carta del Joint Venture – fechada 26 de febrero de 2018; y a la información que allí le proveyó la firma de contables UHY Del Valle y Nieves, PSC, en torno a que en el *Contrato* "[se] *estipula que el contratista está exento de los arbitrios de construcción y de los permisos de OGPe*".

(28) En su carta del 16 de enero de 2020 el MAF notificó al JV una *deficiencia preliminar* de $1,052,757.16 por concepto de arbitrios de construcción adeudados, penalidad, intereses y recargos.

(29) El MAF utilizó la información provista por el JV en la *Declaración Jurada* del 3 de octubre de 2019 para tasar y computar el arbitrio de construcción impuesto mediante la *Deficiencia Preliminar*.

(30) El MAF estuvo evaluando el estado contributivo del JV hasta el 16 de enero de 2020.

(31) Mediante carta del 31 de enero de 2020, el JV solicitó reconsideración de la *Deficiencia Preliminar*.

32) En su carta del 31 de enero de 2020, sobre NOTIFICACIÓN DE ARBITRIOS DE CONSTRUCCIÓN, el JV informó al MAF que el promedio de costos de reparaciones por unidad fluctuó en alrededor de $10,000.00, incluyendo el costo de los equipos a entregarse y las inspecciones necesarias.

(33) El 6 de febrero de 2020, JV presentó *Demanda* judicial sobre Impugnación de Arbitrios de Construcción y Sentencia Declaratoria – mediante la cual solicitó al Tribunal que dejara sin efecto la *Deficiencia Preliminar*.

Al iniciar la *Sentencia*, el foro primario identificó como las dos controversias a resolver las siguientes: (1) si el Municipio tenía autoridad legal para imponer el pago de arbitrios de construcción por los trabajos de reparación temporera realizados por Joint Venture bajo el programa THR; (2) si la notificación de deficiencia remitida por el Municipio a Joint Venture fue oportuna y adecuada. En su fundamentada determinación, el foro primario contestó la primera de dichas interrogantes en la afirmativa,

pero en la negativa la segunda. Por tanto, aunque el foro apelado concluyó que la actividad de construcción realizada por Joint Venture en el Municipio sí estaba concebida dentro de la acepción *actividad de construcción* descrita en el Art. 1.003(dd) de la LMA, (por lo que quedaba sujeta al pago de arbitrios de construcción), el Municipio no actuó de manera diligente al requerir su pago, en contravención con los términos que la ley dispone para ello, lo que le impedía reclamarlos.

Insatisfecho, el Municipio solicitó reconsideración ante el mismo foro primario, respecto a la presunta falta de diligencia en gestionar el cobro los arbitrios de construcción sobre los trabajos de reparación realizados por Joint Venture. En lo particular, esta parte juzgó que el dictamen del TPI al respecto validó la acción ilegal de Joint Venture de evadir su responsabilidad contributiva, lo que le impidió, a su vez, corregir un error administrativo y recuperar fondos públicos.

El Dpto. de la Vivienda también solicitó reconsideración al TPI, pero sobre la determinada facultad del Municipio para imponer los arbitrios de construcción en pugna. Sostuvo que el sentido legal de la definición de *reparación* en la que se fundamentó la *Sentencia* para concluir que el Municipio sí podía exigir el pago de arbitrio, resultaba inaplicable, puesto que los trabajos realizados bajo el Programa STEP no reestablecieron las viviendas al estado en que se encontraban antes de sufrir el daño.

El TPI denegó ambas mociones de reconsideración.

Es así como, el 12 de marzo de 2024, el Municipio presentó el *recurso de apelación* ante nuestra atención, planteando los siguientes errores:

PRIMER ERROR:

ERRÓ EL TPI AL NO CONSIDERAR LA INTENCIÓN DE JV DE AUTO DE EXIMIRSE MEDIANTE EL CONTRATO FIRMADO CON EL DEPARTAMENTO DE LA VIVIENDA Y QUE CUANDO PRESENTÓ LA SOLICITUD DE PATENTES DEL 26 DE

FEBRERO DE 2018 YA HABÍA COMENZADO LA OBRA DE CONSTRUCCIÓN.

SEGUNDO ERROR:

ERRÓ EL TPI CUANDO INTERPRETÓ QUE LA SOLICITUD DE PATENTES DEL 26 DE FEBRERO DE 2018 ACTIVÓ ALGÚN "DEBER DE ACTUAR" O RESPONSABILIDAD LEGAL DEL MAF Y ADJUDICAR QUE UN ERROR EN EL TRÁMITE ADMINISTRATIVO CREA DERECHOS.

TERCER ERROR:

ERRÓ EL TPI, CUANDO DE FORMA CONTRADICTORIA, UTILIZA LA SOLICITUD DE PATENTES DEL 26 DE FEBRERO DE 2018 PARA JUSTIFICAR LA EVASIÓN DE JV, CUANDO EL PROPIO TPI DETERMINÓ QUE DICHA COMUNICACIÓN NO ACTIVA LOS TÉRMINOS DISPUESTOS EN EL ARTÍCULO 2.007 DE LA LEY DE MUNICIPIOS AUTÓNOMOS, PORQUE NO CONSTITUYE UNA DECLARACIÓN DE ACTIVIDAD.

CUARTO ERROR:

ERRÓ EL TPI AL LEGISLAR JUDICIALMENTE UN PERIODO DE PRESCRIPCIÓN SOBRE EL COBRO DE ARBITRIOS DE CONSTRUCCIÓN QUE NO SURGE DE LA LEY DE MUNICIPIOS AUTÓNOMOS.

Por su parte, el 8 de abril de 2024, Joint Venture también presentó un *recurso de apelación,* alzando los errores que siguen:

PRIMER ERROR:

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA DE SAN JUAN, AL NO DETERMINAR QUE LA *ORDENANZA NÚMERO 25, SERIE 2010-2011* APROBADA POR EL MUNICIPIO PARA LA IMPOSICIÓN DE ARBITRIOS DE CONSTRUCCIÓN ES *ULTRA VIRES* Y NULA ELLO A PESAR DE HABER RESUELTO QUE EL MUNICIPIO EXCEDIÓ LA FACULTAD DELEGADA POR LA ASAMBLEA LEGISLATIVA AL CONVERTIR EN TRIBUTABLE TODO TIPO DE CONSTRUCCIÓN Y/O REPARACIÓN QUE SE LLEVE A CABO EN EL MUNICIPIO.
SEGUNDO ERROR:

ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA, SALA DE SAN JUAN AL RESOLVER EN LA SENTENCIA APELADA QUE LOS TRABAJOS QUE LLEVÓ ACABO [SIC] JV EN EL MUNICIPIO CONSTITUYEN UNA ACTIVIDAD DE CONSTRUCCIÓN Y ESTÁN SUJETOS AL PAGO DE ARBITRIOS DE CONSTRUCCIÓN A PESAR DE QUE CARECÍA DE JURISDICCIÓN PARA ENTRAR A LOS MÉRITOS DEL CASO YA QUE RESOLVIÓ QUE EL MUNICIPIO NOTIFICÓ A JV DE LA DEFICIENCIA CONTRIBUTIVA LUEGO DE VENCIDOS LOS 15 DÍAS IMPRORROGABLES QUE DISPONE

PARA ELLO EL ART. 2.007 (B) DE LA LEY DE MUNICIPIOS AUTONOMOS[.]

TERCER ERROR:

ERRÓ EL HONORABLE TRIBUNAL DE PRIMER INSTANCIA, SALA DE SAN JUAN, AL DETERMINAR QUE LOS TRABAJOS DE NATURALEZA TEMPORERA REALIZADOS POR JV EN EL MUNICIPIO DE FAJARDO BAJO EL PROGRAMA "TU HOGAR RENACE" CONSTITUYEN "ACTIVIDAD DE CONSTRUCCIÓN" TRIBUTABLES PARA FINES DE ARBITRIOS DE CONSTRUCCIÓN, SEGÚN DEFINIDO EN LA LEY DE MUNICIPIOS AUTÓNOMOS.

El mismo día, el Dpto. de la Vivienda presentó su *recurso de apelación*, con lo siguientes señalamientos de error:

PRIMER ERROR:

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL ADJUDICAR LOS M[É]RITOS DE LA DEMANDA, A PESAR DE HABER DETERMINADO QUE LA NOTIFICACIÓN DE DEFICIENCIA HECHA POR EL MUNICIPIO ERA IMPROCEDENTE POR HABER EXCEDIDO EL T[É]RMINO "IMPRORROGABLE" DISPUESTO POR LA LEY DE MUNICIPIOS AUTÓNOMOS.

SEGUNDO ERROR:

ERRO EL TRIBUNAL DE PRIMERA INSTANCIA AL NO CONSIDERAR LA NATURALEZA Y ALCANCE DE LOS TRABAJOS AUTORIZADOS BAJO EL PROGRAMA TU HOGAR RENACE, NI LAS DISPOSICIONES EXPRESAS DE LA SECCIÓN 403 DE LA LEY STAFFORD QUE CREÓ DICHO PROGRAMA.

TERCER ERROR:

ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DESCARTAR EL SENTIDO LEGAL DE LA DEFINICIÓN DEL TÉRMINO "REPARACI[Ó]N" ADOPTADO POR ESTE PARA DETERMINAR QUE LOS TRABAJOS BAJO STEP CONSTITUYEN LAS REPARACIONES CONSIDERADAS COMO ACTIVIDAD DE CONSTRUCCIÓN BAJO LA LEY DE MUNICIPIOS AUTÓNOMOS.

Habiendo presentado las partes sus respectivos escritos en oposición a los correspondientes recursos de apelación, estamos en posición de resolver.

## II. Exposición del derecho

### A. Doctrina del campo ocupado

Es norma generalizada que los tribunales estatales ostentan jurisdicción o autoridad para atender todo asunto al amparo de las leyes estatales, y jurisdicción concurrente con los foros federales para considerar asuntos que surjan al amparo de las leyes federales. *Tafflin v. Levitt,* 493 US 455, 458 (1990). No obstante, el Art. VI, cláusula 2, de la Constitución de los Estados Unidos, también conocida como la *Cláusula de Supremacía,* dispone que dicha Constitución y las leyes federales serán la ley suprema del país. US Const. Art. VI, cl. 2. De ahí se deriva que el Congreso tiene el poder de ocupar ("preempt") o adelantarse a la ley estatal. *Crosby v. Nat'l Foreign Trade Council,* 530 US 363, 372 (2000). Específicamente, dicho postulado establece lo siguiente:

> The Constitution, and the Laws of the United States which shall be made in Pursuance thereof; […] shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, anything in the Constitution or Laws of any state to the Contrary not with-standing. Art. VI, Const. EE.UU., LPRA Tomo 1.

Es de la citada disposición que surge la doctrina del *campo ocupado.* En virtud de esta, se evita que surjan conflictos regulatorios entre dos gobiernos, y se fomenta la uniformidad. *Mun. de Peñuelas v. Ecosystems, Inc.,* 197 DPR 5, 14 (2016). De conformidad, el Congreso de los Estados Unidos (el Congreso) puede ocupar el campo sobre un asunto federal y excluir la regulación local. *González v. Mayagüez Resort & Casino,* 176 DPR 848, 856 (2009). La jurisdicción exclusiva del Gobierno federal, en los asuntos federales, puede surgir cuando expresamente lo haya dispuesto el Congreso o cuando la intención de la ley de privar de jurisdicción a los tribunales estatales sea clara. *Mun. de Peñuelas v. Ecosystems, Inc.,* supra, págs. 14-15. Del mismo modo, el campo se ocupa cuando el interés o el propósito federal es tan dominante que no debe existir reglamentación estatal, o, cuando esta podría producir un resultado

incompatible con los objetivos federales en determinada área. (Énfasis provisto). *Íd.*

### B. La Ley de Municipios Autónomos[4] y la facultad para imponer arbitrios de construcción

La Constitución del Estado Libre Asociado de Puerto Rico deposita la facultad de imponer contribuciones en la Asamblea Legislativa. En lo específico, allí se indica que "[e]l poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios se ejercerá según se disponga por la Asamblea Legislativa, y nunca será rendido o suspendido". Art. VI, Sec. 2, Const. ELA, 1 LPRA, pág. 420. Por ello, y en lo pertinente, aunque los municipios no ostentan un poder tributario inherente, "la Asamblea Legislativa mediante mandato claro y expreso puede delegar en [los municipios] la autoridad para imponer y cobrar contribuciones, derechos, arbitrios e impuestos razonables dentro de sus límites territoriales y sobre materias no incompatibles con la tributación impuesta por el Estado". *Interior Developers, Inc. v. Mun. de San Juan*, 177 DPR 693, 703 (2009); *Café Rico, Inc. v. Mun. de Mayagüez*, 155 DPR 548, 553 (2001). Es decir, "los municipios no tienen un poder inherente, independiente del Estado, para imponer contribuciones". *ECA General Contractors, Inc. v. Municipio*, 200 DPR 665, 675 (2018) citando a *Levy, Hijo v. Mun. de Manatí*, 151 DPR 292, 299 (2000); *Ortiz v. Municipio San Juan*, 167 DPR 609, 613 (2006).

El poder impositivo de los municipios quedó consignado en la Ley Núm. 81 del 30 de agosto de 1991, conocida como Ley de Municipios Autónomos de Puerto Rico (Ley de Municipios Autónomos o Ley Núm. 81-1991). Esta ley tuvo como propósito principal otorgar a los municipios un mayor grado de autonomía fiscal y de gobierno propio para que pudieran

---

[4] Nos referimos a la derogada Ley de Municipios Autónomos, Ley Núm. 81-1991, en lugar del vigente Código de Municipal de Puerto Rico, Ley Núm. 107-2020, pues era la ley vigente a la fecha en que fue suscrito el *Contrato*.

atender cabalmente sus responsabilidades. Exposición de Motivos, Ley Núm. 81-1991, 21 LPRA Sec. 4001 *et seq*. Como parte de la mencionada política pública, se le reconoció a todo municipio autonomía en el orden jurídico, económico y administrativo, lo que incluía la libre administración de sus bienes, disposición de sus ingresos y la forma de recaudarlos e invertirlos. Art. 1.006 (a) de la Ley Núm. 81, 21 LPRA Sec. 4004 (a). En consecuencia, la Ley de Municipios Autónomos otorgó la facultad a las entidades municipales de imponer y cobrar contribuciones o tributos, entre ellos, la de imponer y cobrar contribuciones, derechos, licencias, arbitrios de construcción y otros arbitrios e impuestos, tasas y tarifas razonables, dentro de los límites territoriales del municipio a través de ordenanzas municipales. Art. 1.003 (cc) y 2.002 (d) de la Ley Núm. 81-1991, 21 LPRA Sec. 4001 (cc) y 21 LPRA sec. 4052 (d). *HBA Contractors v. Mun. de Ceiba*, 166 DPR 443, 454 (2005).

A la luz de la normativa mencionada, en *ECA Contractors v. Mun. de Mayagüez*, supra, el Tribunal Supremo estableció que para que surgiera la obligación de pagar el arbitrio de construcción debían concurrir las siguientes circunstancias: (1) que hubiese una obra de construcción; (2) que se encuentre dentro de los límites territoriales del municipio, y (3) que esta fuera realizada por una persona natural o jurídica privada, o una persona natural o jurídica privada contratada por una agencia o dependencia del gobierno central, municipal o federal. *Interior Developers v. Mun. de San Juan*, supra, pág. 705.

El Art. 1.003 (cc) de la Ley Núm. 81-1991 dispone que el *arbitrio de construcción* es una contribución municipal que debe ser impuesta por medio de una ordenanza municipal aprobada con dos terceras partes de la Asamblea Municipal, la cual recae sobre el derecho de llevar a cabo una actividad u obra de construcción dentro de los límites territoriales del municipio.

A tenor del citado artículo, el Municipio de Fajardo aprobó la Ordenanza 25, Serie 2010-2011 con el propósito de imponer y cobrar los derechos y arbitrios dentro de sus límites territoriales. En su sección tercera, se define allí *actividades tributables* como sigue:

> Se imponen los arbitrios que más adelante se detallan por concepto de erecciones, construcciones, reconstrucciones, ampliaciones, alteraciones, reparaciones, demoliciones, remociones de materiales tóxicos y no tóxicos, relocalizaciones y mejoras de cualquier estructura o edificación, caminos, calles, carreteras y puentes, muelles, excavaciones, limpieza, dragado, canalización de ríos y quebradas, instalaciones de tuberías, cables, cable televisión y para cualquier instalación, movimiento de tierra, hincado de postes y pozos, instalaciones de antenas para uso comercial, proyectos de infraestructura y cualquier otra obra o proyecto no contemplado en esta Ordenanza dentro de los límites territoriales del Municipio.

Ahora bien, el Art. 1.003 (dd) de la Ley de Municipios Autónomos, *supra*, define *actividad de construcción* como sigue:

> [s]ignificará el acto o actividad de construir, reconstruir, remodelar, reparar, remover, trasladar o relocalizar cualquier edificación, obra, estructura, casa o construcción de similar naturaleza fija y permanente, pública o privada, realizada entre los límites territoriales de un municipio, y para la cual se requiera o no un permiso de construcción expedido por la Oficina de Gerencia de Permisos o por un municipio autónomo que posea tal autoridad. Significará, además, la pavimentación o repavimentación, construcción o reconstrucción de estacionamientos, puentes, calles, caminos, carreteras, aceras y encintados, tanto en propiedad pública como privada dentro de los límites territoriales de un municipio, y en las cuales ocurra [cualquier movimiento de tierra o en las cuales se incorpore] cualquier material compactable, agregado o bituminoso que cree o permita la construcción de una superficie uniforme para el tránsito peatonal o vehicular. Incluye cualquier obra de excavación para instalación de tubería de cualquier tipo o cablería de cualquier naturaleza y que suponga la apertura de huecos o zanjas por donde discurrirán las tuberías o cablerías dentro de los límites territoriales de un municipio. *Íd.*

### C. Sección 403 de la Ley Stafford

Tras una declaración de desastre por el Presidente de los Estados Unidos, el *Stafford Act* establece, en lo pertinente, lo siguiente:

> Federal agencies may on the direction of the President, provide assistance essential to meeting immediate threats to life and property resulting from a major disaster, as follows:
> ....

(3) Work and services to save lives and protect property
Performing on public or private lands or waters any work or services essential to saving lives and protecting and preserving property or public health and safety, including--
    (A) debris removal;
    (B) search and rescue, emergency medical care, emergency mass care, emergency shelter, and provision of food, water, medicine1 durable medical equipment, and other essential needs, including movement of supplies or persons;
    (C) clearance of roads and construction of temporary bridges necessary to the performance of emergency tasks and essential community services;
    (D) provision of temporary facilities for schools and other essential community services;
    (E) demolition of unsafe structures which endanger the public;
    (F) warning of further risks and hazards;
    ....
(1) General rule
During the immediate aftermath of an incident which may ultimately qualify for assistance under this subchapter or subchapter IV-A of this chapter, the Governor of the State in which such incident occurred may request the President to direct the Secretary of Defense to utilize the resources of the Department of Defense for the purpose of performing on public and private lands any emergency work which is made necessary by such incident and which is essential for the preservation of life and property. If the President determines that such work is essential for the preservation of life and property, the President shall grant such request to the extent the President determines practicable. Such emergency work may only be carried out for a period not to exceed 10 days.

42 USCA sec. 5170b.

**D. Error Administrativo**

Como regla general, un error administrativo es rectificable, puesto que no crea un estado de Derecho que obligue a un cuerpo administrativo. *Rivera Padilla v. OAT*, 189 DPR 315, 345 (2013). Empero, esta norma no aplica automáticamente ante su mera invocación. *Íd.* Más bien, para que aplique esta doctrina, la entidad debe actuar de forma incorrecta, ilegal o *ultra vires. Íd; Camacho Torres v. AAFET,* 168 DPR 66, 95 (2006). Una actuación nula es inexistente, por lo tanto, no genera consecuencia jurídica alguna. *Brown III v. J.D. Cond. Playa Grande,* 154 DPR 225, 239 (2001). De lo que se sigue que nadie puede ampararse en una actuación

administrativa incorrecta o ilegal. *Junta de Licenciamiento y Disciplina Medica v. Cabral Jiménez*, 201 DPR 157, 169 (2018).

### E. Orden Administrativa OGPE-2017-07 y OGPE-2018-01

La OGPe emitió la Orden Administrativa 2017-07 intitulada, *Para Eximir del Trámite Ordinario de Permisos de Construcción y Urbanización y el Pago de Derechos a Ciertas Actividades Esenciales Afectadas por el Huracán María con el Fin de Realizar Trabajos de Construcción* el 6 de octubre de 2017.[5] En lo pertinente, en su Sección primera estableció que:

> [s]e exime del trámite ordinario los permisos de construcción o urbanización a presentarse ante la OGPe o Municipios Autónomos que cuenten con un convenio de transferencia de facultades delegando jerarquías conforme a las disposiciones de la Ley 81-1991, *supra*, como paso previo a efectuar cualquier obra de reconstrucción, reparación o reposición para restablecer la infraestructura de Puerto Rico y aliviar las necesidades básicas de la población. OGPE-2017-07.

Luego, el 4 de enero de 2018, la OGPe también expidió la Orden Administrativa OGPE-2018-01; *Para Aclarar los Trámites Sobre los Cuales el Departamento de la Vivienda Está Exento de Permisos de Construcción para Llevar a Cabo Mejoras que Permitan el Uso de Residencias Unifamiliares como Refugios Bajo el Programa "Sheltering and Temporary Essential Power" (STEP) de FEMA para Personas Deplazadas de sus Hogares por el Huracán María*. De la referida Orden Administrativa se desprende lo siguiente:

> **PRIMERO:** Los proyectos a cargo del Departamento de la Vivienda para llevar a cabo mejoras que permitan el uso de residencias unifamiliares como refugios por sus dueños, estarán limitadas a reparaciones menores según definidas por FEMA acorde con la política adoptada por dicha agencia federal para el programa "STEP".

> **SEGUNDO:** Conforme dispuesto en el Reglamento Conjunto, las siguientes obras no se consideran obras de construcción y no requerirán un permiso de construcción, siempre y cuando no formen parte de otra obra o desarrollo mayor:
> 1. Pintura de Edificios o estructuras existentes.
> 2. Sellado de techos.

---

[5] Apéndice del recurso de Apelación del Municipio de Fajardo, págs. 584-588.

3. Trabajos de jardinería.
4. Relleno de grietas, salideros y goteras en el edifico [sic] o estructura.
5. Enlucido (empañetado) de obras de hormigón existentes.
6. Instalación o cambio de losetas de piso, azulejos, cerámica o cualquier otra terminación de piso o pared.
.... OGPE-2018-01.

Similarmente, la Sección tercera de la Orden reseñada continúa con un listado de reparaciones y construcciones menores o sustituciones sencillas eximidas de solicitar un permiso de construcción.[6]

## III. Aplicación del derecho a los hechos

a.

Se ha planteado una controversia referente a la alegada ocupación del campo por una ley federal, por lo cual nos compete interpretar el articulado pertinente de la Ley Núm. 81-1991. Ya hemos advertido que, si una ley estatal contraviene una ley federal, la primera será nula. *Lilly del Caribe v. Mun. de Carolina*, 210 DPR 306, 318-319 (2022). En específico, iniciamos nuestra aplicación del derecho abordando la interrogante sobre si imponer arbitrios de construcción a los actos de reparar las residencias elegibles bajo el programa STEP, produce un resultado incompatible con los objetivos federales de la Sección 403 de la Ley Stafford, 42 USCA Sec. 5170b, bajo los cuales están autorizados.

Es el Dpto. de la Vivienda que ha promovido la teoría de que aquí interviene la doctrina del campo ocupado, aduciendo que las tareas, medidas y trabajos de emergencia realizados bajo el Programa STEP no constituyen *actividad de construcción*, según esta es definida por la Ley Núm. 81-1991, 21 LPRA Sec. 4001 *et seq.* Sujeta tal aseveración al razonamiento de que la definición del término *reparación* resulta incompatible con los objetivos y disposiciones de la Ley Stafford, 42 USCA

---

[6] Apéndice del recurso de Apelación del Municipio de Fajardo, págs. 589-593.

Sec. 5121 *et seq*. Es decir, aparenta que la teoría legal que sugiere el Dpto. de Hacienda sobre este asunto descansa no en la afirmación de que el Congreso expresamente dispusiera privar de jurisdicción a los estados sobre legislar en este tema, sino que el campo ocupado resulta de que interpretar según lo hizo el Municipio produciría un resultado incompatible con la legislación federal.

Contrario a ello, adelantamos, juzgamos que la provisión de asistencia por el gobierno federal a los estados y gobiernos locales a través de la referida legislación, no resulta incompatible con el poder tributario delegado a los municipios bajo la Ley Núm. 81-1991. Según veremos, como parte de dicha asistencia federal, uno de los actos esenciales que se deben ejecutar con la mayor premura es estabilizar o neutralizar la situación de peligrosidad al **reparar** las residencias ubicadas en las zonas de desastre.

Para suplementar su alegación, el Dpto. de la Vivienda añade que "es un hecho incuestionable" que "STEP no constituye un programa de reparación". Esta interpretación surge del siguiente fragmento tomado de la guía para implementar el programa piloto STEP:

> UNDER STEP, FEMA provides funding for basic, minimal work to survivors to shelter in-place for an extended period. **The Stafford Act Section 403 is not a repair program, but an authority to provide emergency assistance for life sustaining and public health and safety needs for emergency sheltering,** homes that cannot be made safe for sheltering with this minimal work are not eligible for STEP.
> STEP assistance is an **emergency protective measure** provided under Section 403 of the Stafford Act **to support efforts to save lives and protect public health and safety, including the provision of emergency sheltering**; therefore, STEP emergency protective measures do not affect a FEMA IHP applicant's eligibility for repair, replacement, or permanent or semipermanent housing construction assistance, if approved, under Section 408 of the Stafford Act and its implementing regulations. *Sheltering and Temporary Essential Power (STEP) Pilot Program for FEMA-4336-DR-PR and FEMA-4339-DR-PR*, FEMA, October 25, 2017. *Véase* Apéndice del recurso de Apelación del Municipio de Fajardo, págs. 330-338. (Énfasis provisto).

De una lectura integrada del referido texto, junto a las múltiples menciones de los actos de reparación incluidos en la guía de implementación del programa STEP, concluimos que el propósito de la frase "[t]he Stafford Act Section 403 is not a repair program" es distinguir aquellas reparaciones comprensivas de las reparaciones mínimas que, como medidas protectoras, son necesarias para que las residencias afectadas sean habitables. Esto es, dado que el propósito de STEP se limita a proveer asistencia de emergencia, **quedan excluidas del programa aquellas residencias que no pueden permanecer seguras y proveer refugio con reparaciones mínimas,** pero, por oposición, sí quedan incluidas las residencias que pueden permanecer seguras y proveer refugio con reparaciones mínimas.

Joint Venture y el Dpto. de la Vivienda parecen estar de acuerdo con esta interpretación, puesto que en la sección de *Background and Purpose of Request for Proposal* del requerimiento de propuestas, la cual se repite en la sección de *Description of STEP*, se reconoce que se trata de un programa de reparación **no comprensivo** debido a que no resultará en la reparación total de las residencias.[7]

Paralelamente, nuestra interpretación encuentra aval en la fuente citada por el mismo Dpto. de Vivienda: el reporte del Inspector General del Departamento de Homeland Security intitulado *FEMA's Sheltering and Temporary Essential Power Pilot Program, OIG-13-15*. FEMA's Sheltering and Temporary Essential Power Pilot Program OIG-13-15, US Department of Homeland Security, Office of Inspector General, December 2012. El referido reporte describe el objetivo del programa STEP como sigue:

> The Federal Emergency Management Agency (FEMA) established the Sheltering and Temporary Essential Power (STEP) pilot program, enabling residents to return to or remain in their homes as a form of **shelter while permanent**

---

[7] Véase Apéndice del recurso de Apelación del Municipio de Fajardo, págs. 196-234. (Específicamente, en la página 202 se establece que "STEP is not a **comprehensive** repair program and will not result in the complete restoration of the dwelling unit").

**repairs are completed.** This program will reduce the number of people in shelters or in the Transitional Shelter Assistance Program.

….

Section 403 of the Stafford Act authorizes FEMA to take emergency protective measures to save lives and property (Category B), as part of its public assistance program. The purpose of the STEP pilot program is "to assist State, local, and Tribal governments in performing work and services essential to saving lives, protecting public health and safety, and protecting property." **FEMA intends STEP to provide essential** power and **repairs to affected residences,** thereby reducing the demand for other shelter options and allowing people to return to or remain in their homes. Íd., págs. 2-3 (Énfasis suplido).

De aquí que la intención de FEMA al implementar el programa piloto STEP era que proporcionara **reparaciones esenciales** a las residencias afectadas para que las personas pudieran permanecer en sus hogares.

Lo anterior, unido a que, como expondremos más adelante, la Ley Núm. 81-1991, 21 LPRA Sec. 4001 *et seq.*, faculta a los municipios a imponer arbitrios de construcción sobre *reparaciones*, **independientemente de la naturaleza temporera o permanente de estas**, nos conduce a sostener que tal legislación estatal no resulta incompatible con los objetivos de STEP. De ello se sigue que el Municipio no esté vedado de imponer arbitrios de construcción a las reparaciones de las residencias elegibles bajo el programa STEP que estén ubicadas dentro de su demarcación territorial.

Entonces, atendiendo el argumento según el cual "la sección 403 no contiene lenguaje que permita la ejecución de reparaciones", solo baste decir que el contenido amplio y no taxativo de la Sección 403 de la Ley Stafford, 42 USCA Sec. 5170b (a) (3), provee para que se puedan realizar trabajos para proteger la propiedad, lo que incluye los actos de reparaciones temporeras autorizados por STEP.[8]

---

[8] En lo pertinente, la Sección 403 de la Ley Stafford, 42 USCA Sec. 5170b (a) (3), bajo la cual fue autorizada el programa STEP, implementado en Puerto Rico bajo el nombre Tu Hogar Renace, lee como sigue:

Similarmente, Joint Venture y el Dpto. de la Vivienda alegan que el programa STEP no constituye un programa de reparación, porque los trabajos autorizados bajo este se limitaron a poner en condición estable las residencias elegibles. Dicho argumento se cimenta en que la definición de *actividad de construcción* del Artículo 1.003 (dd) de la Ley Núm. 81-1991, 21 LPRA Sec. 4001, distingue las reparaciones temporeras de las "fijas y permanentes", de manera que, según esta teoría, las primeras quedan excluidas del pago de arbitrios de construcción.

Sin embargo, tal como acertadamente puntualizara el TPI en la *Sentencia* apelada, resulta inconsecuente para determinar si constituye o no una actividad de construcción que las reparaciones ejecutadas en el Municipio sean de naturaleza temporera o permanente, pues "del texto del referido Artículo 1.003 (dd) surge claramente que la frase 'de similar naturaleza fija y permanente' **se refiere a la naturaleza de la estructura donde se lleva a cabo la reparación**, **y no a la naturaleza y/o extensión de la reparación**".[9] En el Art. 1.003 (dd) de la Ley Núm. 81-1991, 21 LPRA Sec. 4001, se define como *actividad de construcción* las siguientes

---

(a) In general
Federal agencies may on the direction of the President, provide assistance essential to meeting immediate threats to life and **property** resulting from a major disaster, as follows:
....
**(3) Work and services to save lives and protect property**
Performing on public or private lands or waters any work or services essential to saving lives and protecting and preserving property or public health and safety, **including--**
....
(B) search and rescue, emergency medical care, emergency mass care, emergency shelter, and provision of food, water, medicine[1] durable medical equipment, and other essential needs, including movement of supplies or persons;
(C) clearance of roads and construction of temporary bridges necessary to the performance of emergency tasks and essential community services;
(D) provision of temporary facilities for schools and other essential community services;
(E) demolition of unsafe structures which endanger the public;
(F) warning of further risks and hazards;
....
(I) reduction of immediate threats to life, property, and public health and safety; and
... Íd. (Énfasis suplido).
[9] El Artículo 1.003 (dd) de la Ley Núm. 81-1991 define "Actividad de construcción" como "el acto o actividad de construir, reconstruir, remodelar, **reparar**, remover, trasladar o relocalizar cualquier edificación, obra, estructura, casa **o construcción de similar naturaleza fija y permanente**, pública o privada, realizada entre los límites territoriales de un municipio...." (Énfasis nuestro).

acciones: construir, reconstruir, remodelar, **reparar**, remover, trasladar o relocalizar; a ello le sigue el objeto de dicha acción, el cual puede ser cualquier edificación, obra, estructura, casa o construcción de similar *naturaleza fija y permanente.* Entonces, aunque las obras autorizadas bajo el programa STEP eran reparaciones temporeras, dado que el citado Art. 1.003 no las distingue de aquellas permanentes, ambas constituyen *actividad de construcción* para fines de la imposición el arbitrio de construcción municipal.

Lo anterior también dispone del primer error planteado por Joint Venture en referencia a que el Tribunal de Primera Instancia no determinara que la Ordenanza Número 25, Serie 2010-2011,[10] aprobada por el Municipio de Fajardo para la imposición de arbitrios de construcción, fuera nula, al Municipio exceder la facultad delegada y convertir en tributable *todo tipo de construcción o reparación* que se lleve a cabo en su demarcación territorial.

Según es sabido, la validez de una ordenanza municipal está condicionada a que sea compatible con la legislación estatal. *Lopez Fed. Coms. Unidos v. Mun. de San Juan,* 121 DPR 75, 88 (1988). En este caso, la Sección tercera de la Ordenanza Número 25, Serie 2010-2011,[11] debe armonizarse con el Art. 1.003 (dd) la Ley Núm. 81-1991, 21 LPRA Sec.

---

[10] Fajardo, Ordenanza para imponer y cobrar derechos, arbitrios o tarifas dentro de los límites territoriales del Municipio de Fajardo, por concepto de todo tipo de construcción, reconstrucciones, relocalizaciones, mejoras, instalaciones, cualquier tipo de obra o infraestructura sea en propiedad privada o pública con fines personales, comerciales o industriales, en carretera estatal, camino o calle municipal, aéreo, sobre o debajo del suelo o subsuelo; y derogar las Ordenanzas Número 6, Serie 2003-2004, Número 11, Serie 2005-2006, Número 20, Serie 2009-2010 y cualesquiera otras ordenanzas anteriores que sean incompatibles con la presente, Ord. Núm. 25, Serie 2010-2011 (7 de diciembre de 2010).

[11] Fajardo, Ordenanza para imponer y cobrar derechos, arbitrios o tarifas dentro de los límites territoriales del Municipio de Fajardo, por concepto de todo tipo de construcción, reconstrucciones, relocalizaciones, mejoras, instalaciones, cualquier tipo de obra o infraestructura sea en propiedad privada o pública con fines personales, comerciales o industriales, en carretera estatal, camino o calle municipal, aéreo, sobre o debajo del suelo o subsuelo; y derogar las Ordenanzas Número 6, Serie 2003-2004, Número 11, Serie 2005-2006, Número 20, Serie 2009-2010 y cualesquiera otras ordenanzas anteriores que sean incompatibles con la presente, Ord. Núm. 25 Sección 3ra, Serie 2010-2011 (7 de diciembre de 2010).

4001. Al compararlas, vemos que la Ordenanza citada incluye como actividad tributable, sin distinguir en cuanto a su naturaleza, las reparaciones. Esto es cónsono con el asunto antes resuelto de que son objeto de arbitrios de construcción las reparaciones temporeras o permanentes dentro de los límites territoriales de los municipios. Entonces, para delimitar el poder tributario de los municipios bajo estas circunstancias, hace falta una lectura integrada de ambos estatutos. Ante el silencio de la Ordenanza Número 25, Serie 2010-2011, concluimos que la facultad de los municipios de imponer arbitrios de construcción sigue estando limitada a aquellas estructuras de "naturaleza fija y permanente", en tanto requiere mantener su compatibilidad con la legislación que pretendió instrumentalizar.

En cualquier caso, lo anterior no tiene efecto sobre la interrogante medular a ser dilucidada, por lo que no acogemos el intento de Joint Venture de eximirse de su obligación contributiva al reclamar una omisión que es inconsecuente para la presente controversia. Afirmamos esto pues lo que se nos plantea, con precisión, es la presunta exclusión del poder tributario del Municipio sobre las **reparaciones temporeras** autorizadas bajo STEP o THR. Como ya discutimos, no son las *reparaciones* las que deben ser de *naturaleza fija o permanente*, sino *las estructuras* objeto de las reparaciones. Entonces, dado que en el presente caso no se cuestiona la validez de la Ordenanza citada por imponer un arbitrio de construcción sobre las reparaciones realizadas en estructuras que no sea de naturaleza *fija y permanente*, concluimos que el primer error formulado por Joint Venture tampoco fue cometido.

Como queda visto por lo discutido hasta aquí, nos encontramos en completa armonía con el razonamiento expuesto por el TPI que lo llevó a concluir que las reparaciones efectuadas por Joint Venture constituyen el tipo de actividad de construcción sobre las cuales la Asamblea Legislativa

facultó a los municipios a cobrar arbitrios de construcción. A lo que añadimos que el Municipio sí estaba habilitado por la Ley Núm. 81-1991 para imponer el referido arbitrio de construcción, sin impedimento legal ulterior, puesto que el campo no estaba ocupado por legislación o reglamentación federal que lo impidiera.

b.

La próxima controversia planteada nos requiere abordar interrogantes relativas al término con el cual el Municipio contaba para notificar la deficiencia contributiva a Joint Venture, según este es establecido por el Art. 2.007 (b) de la Ley Núm. 81-1991, 21 LPRA Sec. 4057. Ello también supone verificar las obligaciones del responsable de llevar a cabo la obra (Joint Venture) al momento de presentar una *declaración de actividad* que activara el inicio de término para que el Municipio le notificara la deficiencia contributiva.

Sobre la anterior, el foro primario concluyó que, al notificar la deficiencia contributiva el 31 de enero de 2020, el Municipio faltó a la obligación impuesta por el Artículo 2.007 (b) de la Ley Núm. 81-1991, 21 LPRA Sec. 4057, de llevar a cabo tal ejercicio dentro del término improrrogable de quince (15) días. Por lo cual, razonó que el incumplimiento del Municipio con el término de notificación aludido tornó en inadecuada e inválida la deficiencia contributiva notificada a Joint Venture, relevándolo del pago de arbitrios de construcción. No coincidimos.

Como adelantamos, el Art. 2.007 de la Ley Núm. 81-1991, 21 LPRA Sec. 4057, contiene las directrices que gobiernan el trámite por el cual el Municipio requiere el pago de arbitrios de construcción a la persona que lleva a cabo la obra como dueño o su representante, en nuestro caso, Joint Venture. En ese contexto, surge como obligación inicial de la persona que lleva a cabo la obra, la de **presentar** ante la Oficina de Finanzas del

municipio una *declaración de actividad;* **detallada por renglón, que describa los costos totales de la obra a realizarse**. Es la correcta radicación de dicha *declaración,* en el que su contenido se ajuste los elementos resaltados, la que **activa** el deber del Director de Finanzas del Municipio, o de su representante autorizado, de revisar el valor estimado de la obra **declarado por el contribuyente**. Art. 2.007 (a)(b) de la Ley Núm. 81-1991, 21 LPRA Sec. 4057. Además, debe informar su decisión mediante correo certificado con acuse de recibo o entrega al solicitante, antes de quince (15) días **después de radicada la *declaración de actividad*.** Art. 2.007 (b) de la Ley Núm. 81-1991, 21 LPRA Sec. 4057.

Reiteramos, el cumplimiento con el requisito de presentar la *declaración de actividad* ante la Oficina de Finanzas es la **condición necesaria** para que el Director de Finanzas proceda a aceptar o rechazar el valor de la obra estimada, en este caso, por Joint Venture. Sobre esto, véase a modo persuasivo, *Carro & Carro Enterprises, Inc. v. Municipio de Las Marías*, KLAN202400090, en la pág. 22, (21 de mayo de 2024).

Cónsono con lo referido, a partir del recibo de la *declaración de actividad*, el inciso (b) del Art. 2.007 (b) de la Ley Núm. 81-1991 le confiere al Director de Finanzas la facultad de escoger uno de dos cursos a seguir. El primero, aceptar el valor estimado de la obra y determinar el importe del arbitrio de construcción con base a este. El segundo, **rechazar** el valor estimado de la obra **declarado por el contribuyente**. Este último curso le impone la obligación de estimar preliminarmente el valor de la obra antes de imponer el arbitrio, dentro del término improrrogable de quince (15) días **contados a partir de la radicación de la declaración por el contribuyente.** Finalmente, la determinación preliminar debe ser notificada al contribuyente por correo certificado con acuse de recibo o personalmente con acuse de recibo.

Es decir, la obligación que impone al Municipio el Art. 2.007 de la Ley Núm. 81-1991, 21 LPRA Sec. 4057, es la de rechazar el valor de la obra **que surge de la declaración de actividad sometida por el contribuyente** dentro del término improrrogable de 15 días. No obstante, nótese que la legislación citada no impone un término al Municipio en el que tuviera que considerar, admitir o rechazar el argumento que Joint Venture incluyó en la comunicación de 26 de febrero de 2018, en el que afirmó que por disposición del *Contrato* suscrito con el Dpto. de Vivienda estaba exento de los arbitrios de construcción y de los permisos de OGPe.

Sobre lo mismo, para rechazar la posición del contribuyente sobre si estaba o no obligado a pagar el arbitrio de construcción, la Ley Núm. 81-1991, 21 LPRA Sec. 4001 *et seq.*, no provee un término prescriptivo. Empero, ello no libera al Municipio de su obligación de cobrar sus acreencias, la cual surge, por ejemplo, del Art. 6.005 (j) de la Ley Núm. 81-1991, 21 LPRA Sec. 4255. Según este artículo citado, se le impone la obligación continua a la Unidad Administrativa de Finanzas de los municipios de identificar y certificar las cuentas por cobrar. Además, el mismo estatuto establece que para declarar una cuenta incobrable, el municipio debe llevar a cabo acciones afirmativas de cobro y tener al menos cinco (5) años de vencida. *Íd.*

Entonces, para dilucidar el asunto medular sobre si la presunta *declaración de actividad* instada por Joint Venture cumplió con los requerimientos legales para activar los términos que corren en contra del Municipio, debemos evaluar el contenido de la carta que el primero enviara el 26 de febrero de 2018, y su posterior declaración jurada del 3 de octubre de 2019. Es decir, resulta necesario verificar con precisión lo que Joint Venture informó al Municipio a través de dichos documentos para ver si cabía considerarlos como una *declaración de actividad,* según esta es definida por ley.

El Art. 2.007 de la Ley Núm. 81-1991, 21 LPRA Sec. 4057, establece dos requisitos que debe cumplir una *declaración de actividad*: (1) **que la actividad de construcción declarada se encuentre detallada por renglón[12] y; (2) que describa los costos totales de la obra a realizarse**. El propósito de estos requisitos es que el Director de Finanzas pueda evaluar las partidas tributables *vis a vis* las exentas, si las hay, para luego calcular la obligación contributiva resultante del costo total de la obra. De lo contrario, el omitir la declaración de actividad con tales requisitos, impide que el Municipio atienda las impugnaciones sobre partidas exentas de los arbitrios de construcción.

Aplicando esta normativa al caso ante nos, nos resulta evidente que la carta del 26 de febrero de 2018, ni la declaración jurada del 3 de octubre de 2019 cumplieron con los requisitos enumerados en el párrafo que antecede, para considerarlas propiamente una *declaración de actividad.* En la carta de 26 de febrero de 2018, no hay rastro alguno de una *actividad de construcción* que se encuentre **detallada por renglón** y menos aún se ofreció una **descripción de los costos totales de la obra a realizarse**. Claro, la falta de cumplimiento con los requisitos de una *actividad de construcción* resulta explicable a partir del hecho de que, a todas luces, Joint Venture remitió tal carta con el convencimiento de haber sido librado del pago de arbitrios por causa del *Contrato* firmado con el Dpto. de Vivienda, a pesar de lo que manda la Ley Núm. 81-1991 al respecto. Simplemente, no fue la intención de Joint Venture cumplir con los requisitos de una *declaración de actividad* que juzgó no tenía que presentar. Tal cual acentuamos al enumerar los elementos que componen una *declaración de actividad* en el párrafo que antecede, resultaba indispensable en esta desglosar las partidas tributables por constituir

---

[12] Ejemplo: gastos incurridos por concepto de seguros, permisos, servicios legales, administración, transportación, y/o ganancias.

actividades de construcción. Mas aún, no pasa desapercibido que la carta del 26 de febrero de 2018, **cuyo objetivo expreso fue solicitar la patente provisional**, no incluyó siquiera el costo total de la obra, aunque fuese uno estimado. Resulta inescapable la conclusión de que la carta 26 de febrero de 2018 bajo discusión no proveyó ni los elementos mínimos necesarios para poder considerarse como una *declaración de actividad,* de modo que incidió el TPI al atribuirle tal comunicación los efectos que causa la presentación de una *declaración de actividad*, en términos del tiempo que tiene el Municipio para hacer la reclamación de los arbitrios correspondientes.

Igual suerte corre el análisis sobre la declaración jurada de 3 de octubre de 2019, que carece de la declaración de actividad *detallada por renglón,* ni una *descripción de los costos totales de la obra a realizarse.*

A pesar de lo anterior, advertimos, el Municipio calculó el costo total de la obra realizada por Joint Venture, por $16,449,330.61, a partir del valor certificado por el Dpto. de la Vivienda incluido en la declaración jurada del 3 de octubre de 2019.[13] Sin embargo, toda vez que, por lo explicado, esta no es una *declaración de actividad*, según exigida por el Art. 2.007 de la Ley Núm. 81-1991, 21 LPRA Sec. 4057, que activara el procedimiento para imponer el arbitrio de construcción correspondiente, incurrió en un error administrativo el Municipio al así actuar. Como es sabido, "[u]n error administrativo no crea un estado de derecho que obligue a una agencia ni impida su corrección". *Junta de Licenciamiento y Disciplina Medica v. Cabral Jimenez*, 201 DPR 157, 1169 (2018). Por lo tanto, "[n]inguna persona puede ampararse en una actuación administrativa incorrecta o ilegal". *Íd.*

En consecuencia, determinamos que Joint Venture no presentó la *declaración de actividad* requerida por el por el Art. 2.007 de la Ley Núm.

---

[13] Apéndice del recurso de Apelación del Municipio de Fajardo, págs. 278-280.

81-1991, 21 LPRA Sec. 4057, en tanto la documentación presentada incumplió con los requisitos legales para que se le considerara como tal. De esto se deriva que no se activó la obligación del Director de Finanzas del Municipio, o su representante autorizado, de aceptar o rechazar el valor de la obra estimado. A su vez, ello acarreó que tampoco se activara el término improrrogable de quince (15) días para que estimara preliminarmente el valor de la obra a los fines de imponer el arbitrio de construcción correspondiente, de haber rechazado lo declarado por el contribuyente.

Por último, valga señalar que la Orden Administrativa OGPe 2018-01 solo exime a Joint Venture de su obligación de solicitar y obtener un permiso de construcción, mas no le releva de su obligación en ley de pagar los arbitrios de construcción. Ante el hecho de que desde la Ley Núm. 130 del 17 de julio de 1998, la cual enmendó el Art. 2.002 de la Ley Núm. 81-1991, 21 LPRA Sec. 4052, la intención legislativa fue incluir como tributables las obras que no requieran la solicitud o expedición de permisos de construcción, tuvo razón el TPI al así haber decidido. *Exposición de Motivos*, Ley Núm. 130 del 17 de julio de 1998, 98 LPR Sec. 130; Véase, *Río Construction Corp. v. Municipio de Carolina*, 153 DPR 615 (2001).

A falta de una ley o reglamentación federal que ocupara el campo de la facultad tributaria reconocida al Municipio a través de la Ley Núm. 81-1991, según aquí discutida, las obligaciones contraídas por Joint Venture y el Dpto. de la Vivienda a través del *Contrato* no podían resultar contrarias a dicha legislación estatal. Dichas partes contratantes tampoco podían, a través de un contrato privado, auto eximirse del pago de los arbitrios de construcción correspondientes al Municipio, pues resultaba contrario a la Ley Núm. 81-1991, y afectaba a un tercero que no intervino en tal contratación.

**VI. Parte Dispositiva**

Por los fundamentos que anteceden, se revoca la Sentencia apelada, en los términos explicados. Se refiere el caso a la Agencia Administrativa para que se continúen los procedimientos ya iniciados.

Lo pronunció y manda el Tribunal y lo certifica su Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones